302 IRWIN *et al. v.* DYKE *et al.*

DANIEL IRWIN *et al.*

*v.*

SARAH DYKE *et al.*

*Filed at Springfield June 12, 1885.*

SPECIFIC PERFORMANCE—*parol gift of land by a father to his son.* In this case the facts established were considered sufficient to bring it within the rule, that where a father makes a verbal agreement with a son to convey to him a tract of land if the latter will go and live upon the same, make expenditures upon and improve it, and this is done in reliance upon the promise, a court of equity will enforce the specific performance of the agreement.

APPEAL from the Circuit Court of McLean county; the Hon. OWEN T. REEVES, Judge, presiding.

This was a bill for partition of a certain two hundred acres of land, described in the bill filed October 21, 1881, by Daniel Irwin, and Narcissa Irwin, his wife, setting out that Daniel Irwin was the owner in fee of the undivided half of the land, and that Lewis M. Dyke and said Narcissa Irwin, the only children and heirs at law of Benjamin Dyke, deceased, were the owners in fee of the other undivided half of the land, and praying partition accordingly. The answer of Lewis M. Dyke admits the interest of Daniel Irwin as alleged, and that Benjamin Dyke, at the time of his death, held the legal title to the one undivided half of the land, but that it was in trust for him, Lewis M. Dyke, who was the equitable owner thereof. The answer alleges that from January, 1875, until February, 1879, Lewis M. Dyke and his wife lived at the house of Benjamin Dyke, and, during all that time, worked for him with the horses and farm machinery of said Lewis M., without ever having received any pay therefor, except through said land; that at the time said Lewis M. went to live with said Benjamin, it was under an agreement between them that if the former would come and live with the latter, said

Benjamin would buy a farm, as soon as he got able, for said Lewis M., which the latter should have, and that it was upon that inducement and promise said services were rendered; that about January 1, 1879, the said Benjamin Dyke and Daniel Irwin purchased the land described in the bill; that in pursuance of said agreement, Benjamin Dyke, placed the said Lewis M. in possession of the land, and the land was by the said Benjamin, up to the time of his death, treated, in all respects, as the land of the said Lewis M., but was not deeded to him; that soon after the purchase of the land, Lewis M. and Daniel Irwin partitioned the land between them, by verbal agreement; that the said Lewis M. took possession of his part, and has been in possession ever since, and has put considerable improvement on the same, and has paid about $1200 on the notes given by Benjamin Dyke for the purchase of the land. A cross-bill was filed by Lewis M. Dyke, setting forth the same facts stated in his answer, and praying that the verbal partition of the land between them, made by the said Daniel Irwin and Lewis M., be confirmed, and that the said Irwin and Narcissa Irwin make to the said Lewis M. a deed for his portion of the land. Replications were filed to the answers to the original and cross-bills, and proofs taken, and, on final hearing, the court decreed relief in accordance with the prayer of the cross-bill, and the complainants appealed to this court.

Mr. J. S. NEVILLE, for the appellants:

The mere possession of land under a parol agreement to convey, even with the superadded fact of valuable improvements, will not be deemed sufficient if the possession was obtained otherwise than under the contract. *Padfield* v. *Padfield*, 92 Ill. 198.

To entitle a party to specific performance, the proof must be clear, and it must also be fair, and it must be proved as laid, and not otherwise. *Hatwell* v. *Black*, 48 Ill. 301.

Where a contract for the sale of land rests in parol, it must clearly appear that the contract of sale has been made. Its terms must be clearly proved, and it must appear that they have been relied on and performed by the party seeking the enforcement of the contract, in order to entitle him to a decree for specific performance. *Gosse* v. *Jones,* 73 Ill. 508.

A court of equity, when called on to decree a specific performance of an alleged parol agreement, is asked to exercise an extraordinary jurisdiction. The court must be well satisfied of the existence and character of the agreement, and will always look to the substantial justice of the case. It must be satisfied that any resistance to the completion of the agreement alleged and proved, would operate as a fraud upon the other party. *Selton* v. *Shipp,* 65 Mo. 297.

The act relied upon as a part of performance, must, in itself, furnish evidence of the identity of the contract, and it is not enough that it is evidence of some agreement, but it must relate to and be equitable evidence of the particular agreement charged in the bill. *Wallace* v. *Rappleye,* 103 Ill. 229.

Messrs. Fifer & Phillips, for the appellees:

This court has repeatedly held, that where a father gives land to his son by parol, and the son moves upon the land and makes thereon valuable improvements, the father retaining the legal title in himself, the contract stands upon the same basis as a bargain and sale for a valuable consideration, and equity will compel a conveyance of the legal title. *Smith* v. *Yocum,* 110 Ill. 142; *Warren* v. *Warren,* 105 id. 568; *McDowell* v. *Lucas,* 97 id. 489; *Bohanan* v. *Bohanan,* 96 id. 591; *Langston* v. *Bates,* 84 id. 524; *Kurtz* v. *Hibner,* 55 id. 514; *Bright* v. *Bright,* 41 id. 97; *Ramsey* v. *Liston,* 25 id. 98.

Mr. Justice Sheldon delivered the opinion of the Court:

The Statute of Frauds was not set up in the pleadings, which was necessary to be done in order to avail of that statute.

The proofs quite well establish that Lewis M. Dyke, in August, 1873, soon after he became twenty-one years of age, married, and lived with his parents until in the following spring, when he moved to Blue Mound, and went to farming on his own account. His father, Benjamin Dyke, and his mother, Sarah Dyke, were living on a rented farm, called the "Davis farm," and seem to have been both in feeble health. Benjamin Dyke proposed to his son, Lewis M., that if the latter would come back to the Davis farm, they would work together, and as soon as they got money enough they would buy a farm, and it should be Lewis'. Lewis Dyke thereupon left Blue Mound, where he had been about one year, and, together with his wife, moved back to the Davis farm, where he remained with his father and mother some four years, his wife doing the house-work, and he working on the farm. In the fall of 1878, Benjamin Dyke and Daniel Irwin purchased the two hundred acres of land described in the bill, taking a deed to themselves, jointly. The purchase price of the land was $7000, of which each was to pay one-half. They made a cash payment of $4000, including two assumed incumbrances of $900, and gave their three promissory notes, of $1000 each, due in one, two and three years, respectively. In the spring of 1879, Daniel Irwin and Lewis Dyke took possession by moving upon the land. They made a division of the land between them, and have, from that time down to the present, continued to occupy and cultivate the lands so set apart between them, in severalty. Benjamin Dyke remained on the Davis farm, and died September 19, 1880. Of the purchase money which remained unpaid at the time of the purchase, Lewis Dyke has paid some $1200, a part thereof ($519) having been paid previous to the death

of Benjamin Dyke, and by the decree Lewis Dyke is to pay the balance of $500 remaining unpaid on the last of the three purchase money notes given by Benjamin Dyke and Daniel Irwin. After the purchase of the land, Benjamin Dyke treated the land as belonging to Lewis Dyke, often saying that he bought it for Lewis, and that it was Lewis' land. Although it does appear that on two occasions he expressed an intimation that he might not let Lewis have the land, this is of little weight against the greatly preponderating evidence of the contrary intention. Lewis Dyke made some small improvements upon the land, putting up a smoke-house about ten feet square, and a granary about five by ten feet, as one witness says, or as he says, ten by sixteen feet, and making some little fence.

On two or three occasions, Benjamin Dyke spoke of Lewis having four years' work in the land, thereby recognizing that the purchase of the land was for Lewis in fulfillment of the agreement to buy a farm for the latter, and under which he came to live with his father and performed the services he did for him. It may be said, then, that it was on the faith of the agreement that he should have the land, that Lewis Dyke rendered the services which he did for his father, moved upon and lived on the land, making some improvements, and paid a considerable portion of the purchase money which his father agreed to pay for the land,—as much as $1200 of it. We think this brings the case within the rule of repeated decisions of this court, that where a father makes a verbal agreement with a son to convey to him a tract of land if the latter will go and live upon the same, make expenditures upon and improve it, and this is done in reliance upon the promise, a court of equity will enforce a specific performance of the agreement. *Bright* v. *Bright,* 41 Ill. 97; *Kurtz* v. *Hibner,* 55 id. 514; *Langston* v. *Bates,* 84 id. 524; *Bohanan* v. *Bohanan,* 96 id. 591; *McDowell* v. *Lucas,* 97 id. 489; *Warren* v. *Warren,* 105 id. 568; *Smith* v. *Yocum,* 110 id. 142.

The decree will be affirmed.                     *Decree affirmed.*

Mr. Justice Scott, dissenting:

Dissenting as I do from the opinion of the majority of the court, I wish to state my views of the case at some length.

The case was before this court at a former term, and was reported in 109 Ill. 528. A statement of the object of the bill and of the principal facts appears in the opinion then delivered. The former decree was reversed because the court granted defendant Lewis M. Dyke affirmative relief on his answer, without the filing of a cross-bill. In reference to the merits of the case it was then said: "As the decree is now to be reversed for another cause, the sufficiency of the evidence to sustain the claim of ownership put forth by Lewis M. Dyke to the entire one hundred acres of which the intestate in his lifetime held a legal title, will not now be discussed further than to say the evidence is not of the most satisfactory character. It leaves on the mind very grave doubts, if the contract between the father and son was as it is alleged in the answer to be, whether it could have been enforced against the father in his lifetime; and if it could not have been enforced against him, it certainly could not be enforced against his heirs since his death. The daughter ought not to be divested of her inheritance except upon the clearest and most satisfactory evidence." Since then, Lewis Dyke has filed a cross-bill, in which is set forth the principal fact contained in his original answer, upon which he expects the relief that had been given to him by a former decree.

It seems to be conceded now, as it was on the former hearing, the verbal partition of the lands was fairly made, and no objection is interposed to having it confirmed as was done by the decree. Some complaint is now urged, as was done before, to the decree so far as it assumes to adjust the equities between the parties in interest as to payments made and to be made. It will not be necessary now to consider this branch of the case. The principal contention now is as to whether partition of the one hundred acres of which Benjamin Dyke

died seized, shall be made between his son and daughter, who constitute his only heirs at law, or whether Lewis M. Dyke shall have a decree on his cross-bill for a deed of the land to himself, from the defendants to his bill.

The allegations of the cross-bill upon which Lewis M. Dyke claims title to one-half of the premises which are sought to be partitioned by the original bill, are, that although Benjamin Dyke held the legal title to the premises, he was not the real and equitable owner, but held such title in trust for complainant in the cross-bill, who, it is averred, is the real and equitable owner of an undivided one-half interest in the premises described in the original bill; that during a period of more than five years, viz., from January, 1875, to February, 1879, he lived at the house of Benjamin Dyke, and during that time did farm work and had the care and control of his business, and also employed in the service of Benjamin Dyke several of his own horses and a large amount of farm machinery, and for such services rendered he never received any pay; that as an inducement to complainant to undertake such services, as above mentioned, Benjamin Dyke, on or about the first day of December, 1874, promised and agreed with complainant to buy a farm as soon as he was able, and that complainant should have it, and complainant avers, that, relying upon such promise and agreement of Benjamin Dyke, he went and lived with him, and worked for him, as above stated, and for no other consideration or reason whatever, and that in pursuance of such agreement, Benjamin Dyke, about the first day of January, 1879, with Daniel Irwin, one of the complainants in the original bill, purchased the land sought to be partitioned by the original bill, and that the deed was made to them jointly; that as soon as such land was purchased, Benjamin Dyke placed complainant in possession of his share of the land, and ever since which time, viz., February 24, 1879, he has been in possession and occupancy of the same, and that Benjamin Dyke treated the land in

all respects as belonging to and as the property of complainant in the cross-bill, though for some reason he neglected to make a deed to him. It is also alleged in the cross-bill, that Daniel Irwin, one of complainants in the original bill, and Lewis M. Dyke, soon after the land was purchased, made a division of it, and since then Irwin has in all respects recognized and treated complainant as the owner; but, obviously, what Irwin may have done is a matter of no consequence, as he himself had no interest in that part of the land, and no unauthorized acts of his could bar his wife's rights, whatever they may have been. It is also alleged, that during his occupancy complainant has made considerable improvements on the land, and paid notes given for the land to the amount of $1200, making such payments on the faith of the agreement that he was to have the land, as above set forth. The prayer of the cross-bill is, that the agreement alleged to have been made with Benjamin Dyke be declared valid, that defendants in the cross-bill may be bound by the division made of the land, and that Daniel Irwin and Narcissa Irwin be required to make complainant a deed for that part of the land claimed by him under the alleged agreement with Benjamin Dyke. Defendants answering, deny many of the principal allegations of the cross-bill, and then pray for the same advantage of their answer as if they had demurred to the cross-bill.

The utmost complainant in the cross-bill can insist upon is, that the facts stated in his bill have been fully and satisfactorily proven, and the question naturally arises, are they sufficient in law to authorize the decree. This court reversed a decree in *Smith* v. *Brithan*, 98 Ill. 188, principally because the facts alleged in the bill were not sufficient to authorize the relief granted to complainant. The doctrine was distinctly declared in that case, the decree must be according to the allegations of the bill as well as proofs, and unless the bill states sufficient facts to warrant the decree, it can not stand. Much light will be shed on the subject of the present

inquiry by ascertaining, as near as may be, the character of the cross-bill. It can hardly be said it is a bill strictly for the specific performance of any contract the decedent, if now living, would be bound to perform, or that his heirs, since his death, are obligated to perform. It is a significant fact the bill contains no allegation that Benjamin Dyke, by any contract, verbal or written, or for any consideration, either good or valuable, ever agreed to *convey* the land in question to complainant in the cross-bill. It would be a solecism to assume, where there is no contract of any kind founded upon a good or valuable consideration for a conveyance, there could be a decree for specific performance. In this case the bill does not assume to state any contract for the conveyance of the land. The bill proceeds on another theory. It is, that during a period of four years, viz., from January, 1875, to February, 1879, complainant in the cross-bill lived at the house of Benjamin Dyke, and during that time did farm work and had the control of his business, and also employed in such service some of his own teams and his farm machinery, and for such services rendered he never received any pay; that as an inducement to complainant to undertake such services, Benjamin Dyke, on or about the first day of December, 1874, promised and agreed with complainant to buy a farm as soon as he was able, and that complainant should have it. Relying on such promise, complainant alleges he rendered services as stated. It is then alleged, that in pursuance of such agreement, on or about the first day of January, 1879, Benjamin Dyke, with Daniel Irwin, bought the land sought to be partitioned, taking the deed in the names of Benjamin Dyke and Daniel Irwin, and that immediately Benjamin Dyke placed complainant in possession of his share of the land, and thereafter treated the land as in all respects belonging to complainant. That was in March, 1879, and on September 19, 1880, Benjamin Dyke died seized of the land in controversy. The agreement, as set forth, is

simply that Benjamin Dyke, more than six years before his death, promised complainant that if he would come and live with him, and render certain services, when he got able he would buy a farm, and he should have it. What is all this more than a mere promise by the father to make his son a gift when he should feel able to do so? The utmost that can be said of the agreement, as set forth in the cross-bill, is, that the father promised his son, when he got able to do so, to buy a farm, and the son should have it. That is a promise by the father to buy a farm for his son when he felt able to do it, and nothing more. Certainly no one would insist such a contract could be enforced against the father if living, or against his heirs since his death. But it is said it was in pursuance of the agreement with the son that Benjamin Dyke bought the land sought to be partitioned among his heirs. It must not be forgotten it is nowhere alleged in the bill that Benjamin Dyke, either before or after he purchased the land, ever agreed to convey it to complainant in the cross-bill, and although he lived more than a year after he purchased the land, he never did convey it to his son, and it is not alleged that he ever agreed to or ever talked about doing it. This view of the case is strengthened by observing it is alleged in the bill that all the services complainant rendered were prior to the time Benjamin Dyke bought the land, and yet he took the deed in his own name. It is a most unreasonable assumption that if Benjamin Dyke bought this land for his son in consideration of past services, he would take the deed in his own name, and thereafter retain it, without any promise whatever, either written or verbal, to convey it to his son. Even if the evidence could be considered, which it can not, as aiding the allegations of the bill, it will be seen it makes no stronger case than the cross-bill itself. The extent of what is proven is, that Benjamin Dyke often said he intended the land for his son, Lewis. Of course that is simply the expression of the intention to bestow a bounty upon his

son, and it certainly would not be claimed by any one that equity would compel the execution of such an intention, no matter how many equitable considerations there might be in its support. It may be that afterwards he determined not to carry out the intention he had formed to bestow upon his son a bounty, but whether he did or not is a matter of no consequence. It would be absurd to claim that what the decedent may have intended was binding either on him or his heirs.

The pretence Lewis M. Dyke paid a sum of money of over $1200, or any sum, out of his own money, on the indebtedness of his father contracted for the land, has absolutely nothing in its support. Where did he obtain the money he paid? It is alleged in the cross-bill that complainant had worked five years for his father, and never received anything for such services. Evidently he did not receive the money from that source,—that is, for services rendered his father. Did he have or receive money from any other source? It is not proved that he did. It appears he was married in a few days after he became of age, and that he farmed one year on a rented farm before he went back to live with his father. The proof is he made nothing during the year he farmed. There is no pretence or claim that complainant borrowed the money he paid on the indebtedness of his father. It is therefore plain, from the evidence, that the money he used in making the payments was money that was realized from the farm products raised on and sold from his father's farm, and was, in fact, his father's money. Nothing can be plainer than that complainant had no income from any source during the time he worked for his father, and for the services he rendered his father he alleges in his bill he received nothing.

I am of opinion the decree of the circuit court should be reversed.