PEOPLE'S PURE ICE CO. et al. v. TRUMBULL et al.[1]

TRUMBULL et al. v. FULLER et al.

(Circuit Court of Appeals, Seventh Circuit. October 24, 1895.)

Nos. 203 and 206.

1. CONTRACTS—PART PERFORMANCE—STATUTE OF FRAUDS.
    In a suit for the specific performance of a contract to execute a lease, it appeared that C. and P., from whom complainants derived their rights, called on one T., and proposed to hire certain lands owned by him for the purpose of erecting an ice plant; that the amount of the rent and other terms were agreed on between them, but that C. and P. wanted a lease for ten years, while T. was unwilling to give a lease for more than five; that it was finally agreed between them that a lease should be made for five years, with privilege of renewal for five years at a revaluation, T. to have written leases prepared; that C. and P. thereupon paid a month's rent in advance, and immediately took possession of the land, and proceeded to erect buildings and machinery costing $30,-000, all with the knowledge and consent of T.; that C. and P. continued to pay rent at the agreed rate for several months. *Held,* that there was sufficient part performance of the contract to take the case out of the statute of frauds, and that the successors of C. and P. were entitled to enforce specific performance.

2. RES ADJUDICATA—JUDGMENT IN FORCIBLE ENTRY AND DETAINER.
    A judgment for the plaintiff in forcible entry and detainer proceedings to recover possession of premises of which the defendants were, at law, only tenants from month to month, is not a bar to a suit in equity by such defendants against the plaintiff to enforce specific performance of a contract for a lease of the same premises for five years.

3. SPECIFIC PERFORMANCE—FORM OF RELIEF.
    When a complainant has established a right to specific performance of a contract for a lease, he is not entitled to take, in lieu of such relief, a decree for the value of the improvements he has put upon the premises.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

These suits involve a controversy in regard to the right of the respective parties to an artificial ice plant in the city of Chicago, and to the lot on which the same is situated. The facts and the evidence are quite voluminous. There are bills and answers, and cross bills and answers, all finally consolidated in one suit. The matters involved have been several times referred to a master, and reports made. The first and principal report was set aside, in the main, by the court upon exceptions, and a decree rendered against the opinion and conclusions of the master.

The facts, so far as may be necessary to state them for the proper consideration of the questions involved, are substantially these: Arthur R. Clark and F. O. Pierson, being desirous of engaging in the manufacture of artificial ice in the city of Chicago, applied to Thomas Purcell in December, 1890, to buy or lease from him some ground on which to construct a plant for that purpose. They wanted a lease for ten years, but Purcell did not wish to let them have the ground for more than five years, except upon a revaluation. The final agreement between the parties was that Clark and Pierson should take a lease for five years at a monthly rent of $50 a month, and pay the taxes and water taxes, with the privilege of another five years at a revaluation at the end of the first five, to be settled by arbitration or otherwise, as the parties should agree. By its terms the lease was to commence to run on January 1, 1891. The premises leased were the N. 175 feet of the W. ½ of lot 3, and the E. 22 feet of lot 4 in block 1 in Cook and Anderson's subdivision of the W. ½ of the N. E. ¼ of section 24, in township 39 N., range 13 E. of the third P. M., otherwise known as "Street No. 1278," on West Twelfth street, in the city of Chicago, Cook county, Ill. The understanding was that a written lease was to be executed, embodying these terms, and also giving to Clark and Pierson the right of ingress and egress at the rear of the lot demised. Clark and Pierson paid a month's rent in advance, and went into possession, and built a valuable building and plant for the manufacture of ice, with the knowledge and consent of Purcell, who was to cause to be made out a written lease to be signed by the parties. Purcell did soon after have duplicate leases drawn up, but Clark and Pierson declined to sign them, because there was no provision for ingress and egress according to the verbal agreement, and for the privilege of a renewal for five years upon a revaluation; whereupon Purcell promised to have other leases drawn, embodying such provisions, which was never done. As the suit is brought by Trumbull and Cheverton, the successors of Clark and Pierson, who afterwards formed a corporation to run the plant, known as the People's Artificial Ice Company, to enforce a specific performance of this oral agreement for a five-years lease, and as the principal contest has been over the question whether it was a contract which a court of equity would enforce specifically, we give the substance of the testimony taken before the master upon the question of what it was.

F. O. Pierson testified: "A. R. Clark and myself first saw Thomas Purcell about this property in the fore or middle part of December, 1890. We told him that we were going to erect an ice plant, and asked him if he had any ground that he could either sell or lease us. He said he had something near the elevator, and we made an appointment with him for that afternoon. In the afternoon we looked at these premises. He told us of what opportunities and benefit there were for us to get near the railroad. There was nothing particular done except that he said he would lease it to us at the rate of $50 a month, but that was not carried very far, or much done at that meeting. We made an appointment to meet Purcell, and Clark and myself met him at his house. We talked about the length of the lease mostly. We wanted a lease for ten years at $50 a month. Purcell refused to do that. Then we went on with some other little agreements. He made a note of it on a little piece of paper. The only thing I remember that we could not agree upon was the five years of the lease. We wanted it for ten years, and he would not lease it for that price more than five, and then renewal for five more at a revaluation. There was nothing further said, only we told Purcell that we thought we would take the premises, but wanted a few days to consider the matter, and talk with

Anderson. I can only remember that we disagreed on the five or ten years, and it was at that time it was dropped. He consented to leasing it to us for five years with the privilege of renewal. We were to have.the land for five years at $50 a month. At the end of five years it was to be renewed for five years more, at a revaluation, which could be settled by arbitration or otherwise to suit ourselves. The lease was to begin January 1, 1891. We were to pay taxes, water taxes, etc. Our talk covered fifty feet frontage, and clear back to the other street or alley,—200 and some feet. About three or four days after that, we had another conversation with Purcell; I think Clark was along. There was not anything particular, except that I handed him $50 for the rent, told him that we had concluded to take the place, and asked him to make out leases. He said he could leave that for his attorney to attend to some time. We took possession of the premises within two weeks after that; I think between Christmas and New Year's. We placed the material on the ground, after paying the first month's rent. Purcell's coal yard adjoins this property on the west. Purcell was around· when the material was hauled, upon the premises. It was then vacant. We then commenced to build. Purcell was around at that time. From the 1st of January to the 21st of June, we were making these improvements. We started up first on the 21st of June. We paid rent to Purcell for those six months. We always paid it to him in person. He also gave us a receipt. The receipts are with Clark or the receiver, if in existence. Purcell executed the lease of the premises to us or the artificial ice company. I think the leases are with the receiver; I won't be positive though. I gave them to Clark or the receiver. The leases were never presented to me ,signed by Purcell. His attorney drew them up, I suppose. He did not tell me so, but said he was going to his attorney to have them drawn up. That was in June. The leases were drawn to the People's Artificial Ice Company as lessee. They were not accepted by the People's Artificial Ice Company for several reasons. One was on account of the depth of the land. He agreed that we should have the land clear through to 200 and some odd feet, and the lease read 170 or 180 feet. That gave us no outlet if he had a mind to blockade the rear. We told Purcell of it, and he said he would fix that all right. He would not give us the full depth under any circumstances, but he could make another lease, or put a clause in it that we should have the right of using the land for hauling, the same as himself, and for ingress and egress. This was in June, 1891. In January, 1891, he had shown us the full depth, and wanted to sell it to us. I think· the People's Artificial Ice Company was organized in February, 1891. When the leases were presented to us, we told Purcell we could not sign those leases the way they read. We wanted the full depth. The length of time of the leases was understood when we first talked with him. When we objected to the leases, Purcell said he would produce other leases, and put in a clause the right to use the rear of the lot in common with themselves. The People's Artificial Ice Company continued to pay rent after that. We paid our rent right along until we fell in arrears late in August, 1892. I think in July we ran behind, but we paid him in the latter part of July or the first part of August. I have no receipt showing payment of rents during July and August of 1891. I have only one receipt, and now produce it. It is signed by Purcell. When we were building the property, I saw Purcell around there. He made no objection to our making improvements upon that land. He assisted us in the work. He helped us get in cinders there for filling up. That was the only way he helped. It was filled in where the building went in the first place,—where the freezing tank stands. He was paid for his work. Around the boiler room was also filled up, but Purcell did not do that. We bought some of the cinders from Purcell, and they are now a part of the ground around· the masonry. Purcell was around when we were, building the masonry, and did not make any objection."

Arthur R. Clark testified as follows: "I live at Irving Park, Chicago, and am manufacturing distilled water. I was associated with Pierson in the artificial ice company. I know Purcell and Cheverton. I have seen Trumbull. My first business transaction with Purcell was in October or November, 1890. Pierson and myself were looking for a place to locate our

ice factory. When we first met Purcell, we were talking about buying some land on Tallman street. Purcell suggested some land he had on the corner of 12th street. Pierson, Purcell, and myself went and looked at it. We did not settle anything that day. That was on Sunday, and we were not talking about the lease or anything of that kind. Pierson and myself went to Purcell's house Monday, and saw Purcell; and Pierson gave him $20 on the land, and said it was all satisfactory; we would make arrangements. I think Pierson and myself saw him again Wednesday at his house. We told him we were going to take the land at $50 a month's rent, and Pierson gave him the balance of the month's rent,—$30. I wanted to get the land for ten years, but Purcell did not want to let it go for but five years. Purcell got the $50, and gave Pierson a receipt, and said he would see Munroe about making a lease for five years. The only terms talked about were just as I say. I wanted to get the place for ten years, but he did not want to let us have it over five. He said that we could have it five years, and promised to let us have it for another five years at a revaluation. He made some memoranda of the terms of the lease. There was some dispute. He wanted to have a track through to the corner, so he would not let the whole of the land. There are 265 feet there, and he would not let the whole go. He agreed that we could have the right of way over that land. He said there would always be an outlet in the rear there. We were to pay the taxes and water. After about a week or ten days from paying the rent, we began to haul the material upon the land in controversy. The terms of the lease were to begin January 1, 1891. We were about six months building the plant. Pierson paid right along. Until we got the factory started, we were never behind rent. The July rent was the first we were behind. Purcell was around all the time we were building the plant. He sold us some cinders for it. He never made any objections to our building there. I never said anything to Purcell about the lease, but Pierson gave me a lease that Purcell handed him, and we looked it over, but it was not satisfactory, and it was never signed. I was not present when Purcell handed the leases to Pierson. They were not in compliance with the agreement that he had made with us, or something of that kind; I don't remember in what regard,—something about getting in and out of the place. There were several things. I took possession of the leases prepared by Purcell. I don't know whether I gave them to the receiver or not. I got the leases from Pierson at Aurora, and brought them to the city. Nobody requested me to do so. I showed them to the receiver, and to James Taylor and to Burry. I gave them to some one of the three, and I don't know as I ever saw them again. Taylor and Huszagh told me the leases were of no account to anybody. At the time we were trying to sell to Given, Mr. Burry saw and examined the leases, and said they were of no value. He had some prepared in his own office. The building is constructed on sills 12x12, and they are on posts. The building is not connected with the machinery part of it at all. There is masonry under the boiler and engine, but not under the building. The foundations for the engine, etc., are of the usual character. The foundation of all engines is the same as that,—about twenty cord of stone, and built down in the ground about seven feet. It could not be built any other way. In the case of the engine and compressor, the bolts run through the foundation the same as ordinary. The boiler has a brick and stone foundation. There is about 18,000 to 30,000 bricks in it. It is built in the way that boilers are always built. To remove the machinery, we would have to unbolt it,—take the nuts off the bolts. The bolts run through the foundation, and the machine sets over that; and you take the nut off, and that leaves the foundation and the bolts there, and the machinery can be taken away. There are about twenty-five bolts through that. It would not damage the machinery to take it away. The pipes are all put together with union connections. You would not have to tear up the foundation to take the machinery away. The building would not be any good but kindling wood. It is a temporary structure covered with corrugated iron."

Thomas Purcell, a witness called on behalf of Fuller and others, testified as follows: "I live at No. 1569 West 12th street, and am in the wood and coal business. I own the property at the southeast corner of West 12th

street and Talman avenue, with one hundred and forty feet frontage on West 12th street. I know the property in controversy, and it is a part of the said property that I own. It is fifty feet front on 12th street, and I occupy the other ninety feet front with my coal yard. On the fifty feet referred to, there is an ice manufacturing plant. I receive ground rent for the premises. A. R. Clark and F. O. Pierson first spoke to me about renting the property. That was about two years ago. We have had a good many conversations about it. They first spoke to me of some property on Filmore street, west of Kedzie. Then they wanted fifty feet front of my property running back two hundred and sixty-three feet to Washburne avenue. There was a good deal of discussion in relation to the matter. They wanted a ten-year lease, etc., a five-year lease, and they seemed satisfid with anything they could get. I told them I wanted fifty dollars a month ground rent for the fifty feet front and one hundred and seventy-five feet deep, and that I would not rent over one hundred and seventy-five feet deep, because it would interfere with my coal business at a railroad switch that I wanted to use. They talked over in a slipshod kind of a way that, if they were successful, they would buy the property in a year probably. I said I would be glad to sell any time they were ready to buy it, if we could agree. Nothing was said about the price. The first notice I had that they were really in earnest was when I saw a pile of lumber on the ground, and a carpenter ready to go on with the building. Clark and Pierson put the lumber there. Only what I have stated took place before they took possession. It was after the lumber was on the ground that they paid me the first month's rent of fifty dollars. I never entered into a written lease with them, or agreed with them on the terms for a written lease. They said they wanted the property to erect an ice manufacturing plant on it. They did not describe definitely the character of the improvement. I never before saw an ice manufacturing plant, and did not know what it looked like. It was not discussed as to whom the plant would belong to after it was put up, or who had any right to remove the building they might put on the premises."

On cross-examination, Purcell testified: "When Clark and Pierson came to me, they wanted to buy some cheap property upon which to erect an ice manufacturing plant, and I showed them the cheapest we had. The property suited them very well, but they did not have any money. I told them I would not sell without a payment down, and then asked them how they would like to lease a piece of property, and I took them down, and showed them this property in controversy. There were some objections to the location, and they thought it too expensive. They went off to look up something else. They called at my house a week or two afterwards; I think it was Mr. Pierson. I think he called around and wanted me to make an appointment with him and Clark for the following Sunday. On the following Sunday, I told them I would lease them fifty by one hundred and seventy-five feet for fifty dollars per month, and I told them I would give them an outlet at the rear, of course. They wanted a lease for ten years. I told them I would not tie up the land for that length of time, but was willing to give a lease for five years, and that they might have the property for five years. That was the only conversation we had. There never was any agreement. I wanted them to call around, and I would draft them something on the terms and conditions of the lease that would be satisfactory to make with them, but they never called on me afterwards. I did not agree with them as to the terms of a lease that I would execute to them. I did not fix the time at five years with the privilege of a five-years extension. Yes, sir; I stated that the amount of rental would be $600 a year,— fifty dollars per month. That was as far as we went, that the lease should be fifty dollars per month."

The evidence shows that the People's Artificial Ice Company, which succeeded to the rights of Clark and Pierson, went on in the winter and spring of 1891 and built a plant costing about $30,000; that Purcell had his business office immediately adjacent to the lot leased, and knew that the improvements were being made; that he furnished the ice company coal to use in their business upon the lot, and furnished cinders to put in the foundation for the building, and received monthly rent up to about August,

1891, but that no written lease was ever executed. Purcell, though daily about the premises, made no objections to the putting in of the improvements. Purcell testified, on cross-examination, that Clark and Pierson were to pay rent from January 1, 1891; that his coal office adjoined the property; that the understanding was they were to have a right of way across the strip of land back of the 175 feet, and for free access back and forth; that they wanted to know how they could go out, and he told them they would have to get out the same way he did with the coal; that he saw them making improvements, and did some work for them, and hauled cinders to put under the machinery; that he was in the neighborhood at the time they were making these improvements on the ground, and made no objection, and did not see why he should. When asked, if there was but a month to month letting, why he did not object to their making improvements on his ground, his reply was: "I should think it would be foolishness for me to object," and that he did not consider it his business to stop them. The factory so built was a rather extensive one, consisting chiefly of valuable machinery, the engine and ice-making machine being placed upon stone foundations, the whole inclosed with a wooden structure covered with iron. It was put into operation about June 20, 1891. The cost of the factory greatly exceeded the estimates, so that, when completed, the company was about $15,000 in debt, which they owed to various creditors, and were much embarrassed and pressed for payment. In this condition of affairs, the evidence shows that Purcell refused to execute a lease according to their oral agreement, unless the company should pay him for coal advanced as well as for the rent due. In October following, the promoters of the enterprise applied to the Cook county circuit court for the appointment of a receiver. Thomas Taylor was accordingly appointed, and gave a bond in the sum of $30,000, and took possession of the plant, placing a custodian in charge of the building until a sale was made by the receiver, under order of the court, dated March 14, 1892. The receiver's report of sale, dated March 18, 1892, shows that he sold the plant to A. W. McDougald on March 16th, at public vendue, for the sum of $7,200, which report of sale was duly confirmed by the court on the day of its date. Objections were made by Mr. Burry, in behalf of Fuller (who had succeeded in the meantime, but with full notice, to Purcell's interest in the property), to the confirmation, claiming that the bidding of McDougald was the result of collusion. Burry had bid at the sale against McDougald, and had run this property up to $7,195, or within $5 of McDougald's bid. Burry asked to have a resale, and in that case offered to take the property at $7,500. The master to whom the matter was referred found that the sale was fairly made, but recommended a new sale, which the court refused to allow, and made final confirmation of the sale made by the receiver. So that Trumbull and Cheverton, in whose interest the sale was made, succeeded to the interest of the People's Artificial Ice Company, whatever that might be, in the premises; taking a deed pursuant to the sale from the receiver, and being put in possession by him. Previous to the sale, and about February 5, 1892, Purcell signed a notice directed to the receiver and the ice company, notifying them that he had elected to terminate their tenancy, describing the premises, on March 31st, and requiring them to surrender possession on or before April 1st ensuing, which notice was served upon the receiver. Thereupon the general creditors made strenuous efforts to have Cheverton and McDougald, his counsel, see Purcell, and endeavor to get him to evidence his agreement for a five-year lease in writing, and co-operate with them in getting a fair sale for the benefit of all creditors, Purcell being one; but this Purcell declined to do, saying he had parted with his interest in the premises. After the sale, on March 16th, McDougald tendered to Purcell the rent then due under the lease, and also tendered to him for execution a lease of the premises. Purcell refused to accept the tender or to execute a lease, but directed McDougald to deposit the money in the West Chicago Bank, with the leases, saying, if he decided to execute the leases, he would call at the bank in a few days, and execute them and receive the money. Subsequently, and on April 1, 1892, Mr. McDougald again tendered to Purcell the full amount of rent due to him under the lease up to and including the month's rent which accrued due upon that day. Purcell again refused to receive

the rent, saying that he had "parted" with the premises, but, upon request, he refused to say who was entitled to receive the rent.

On April 2, 1892, Trumbull and Cheverton filed their bill in the circuit court of Cook county against Thomas Purcell, in which they set up substantially the facts heretofore set out in regard to the lease, the receivership proceedings, and the tenders of rent, and prayed for a specific performance of the agreement for a five-years lease at $50 a month, and payment of taxes. Process was served on April 6th, and subsequently a demurrer was filed on the part of Mr. Purcell by James E. Munroe, his solicitor. This suit was afterwards removed to the United States circuit court. Afterwards, on April 13, 1892, Richard B. Fuller appeared in the United States circuit court, Northern district of Illinois, and filed his bill in equity against Thomas Purcell, Trumbull, and Cheverton, setting up as against the former a contract or option given to Mr. Burry for the purchase of the premises in controversy, for the sum of $10,000, which option was on about the 31st of March, 1892, assigned in writing to said Fuller; that, on April 11th, Fuller notified Purcell of his election to purchase, and offered to perform, but Purcell refused; and, as against Trumbull and Cheverton, that they claim and pretend that in March, 1892, they purchased the remainder of the term, took possession of the premises, and refused to surrender possession to Purcell, which refusal Purcell assigns as his excuse for not carrying out his contract; and Purcell's refusal to dispossess Trumbull and Cheverton; that the ice manufacturing plant situated upon said premises has become affixed to the realty, and ought not and cannot be severed therefrom. The prayer is that Purcell be required to make a deed, and that it be found and declared that Trumbull and Cheverton have no interest in the premises. Trumbull and Cheverton filed their answer, denying the allegations of the bill, and setting up their interest in the plant under the sale from the receiver, and their right to a five-years term, commencing January 1, 1891. Purcell defaulted. Afterwards, and on the same day (April 13th), said Fuller commenced in the same court, on the law side thereof, an action in forcible detainer against Trumbull and Cheverton for the restoration of the premises in controversy. Process was duly served, and, instead of filing a plea in that action, apparently by inadvertence, Trumbull and Cheverton filed an appearance only; whereupon a default was taken against them, and judgment entered forthwith for possession, without their knowledge or presence in court. Promptly upon the expiration of the statutory five days, a writ of restitution was issued, under which the marshal, accompanied by Mr. Burry, took possession of the premises for Fuller, May 11, 1892. Application was made before Judge Blodgett to set aside the judgment and allow pleas to be filed. An affidavit was produced, setting up the facts in regard to the possession of Trumbull and Cheverton; and the claim was made upon the motion that the lease under which Trumbull and Cheverton claimed, while invalid at law for the full term agreed upon, yet inured at law, after possession taken and rent paid or tendered, as a tenancy from year to year, determinable, under the statute, only upon 60 days' notice given within the 4 months preceding the end of the year; and that such notice had not been served; and that, therefore, there was a good legal defense to the action. The court, however, on the authorities produced to him, was of opinion that at that time, was of opinion that in no event was a verbal agreement for a term in excess of the period allowed by the statute valid for a longer time than 30 days at law; and, further, that, if the forcible detainer action were on trial, he would have to instruct a verdict accordingly, since, the lease being void under the statute, there were no merits to try at law,—for which reason the motion to open the judgment was denied, the court at the same time suggesting that the defendants might have equities with regard to the right to remove the plant, etc., which could not be there determined, and that a suit in equity was already pending to determine the rights of the parties. Supplementary bills were afterwards filed in the suits pending on both sides, and the cause consolidated and heard together.

The cases arising on these bills, cross bills, and supplementary bills were referred to a master to take testimony, and report the same with his conclusions. The master reported the evidence, and found that no valid lease

was ever made by Purcell to Clark and Pierson, and that the improvements placed upon the premises by the artificial ice company were a portion of the real property and belonging to it, and that Trumbull and Cheverton had no interest in them; that the contract which they relied upon in the bill for specific performance was obnoxious to the statute of frauds; that it was too indefinite to support a decree for specific performance, and was violated and terminated before any offer was made to perform it; and recommended that the bill be dismissed for want of equity. The master also reported that the material facts set out in the bill of Fuller and others were established by the proofs, and that the agreement entered into by Purcell for the conveyance of the premises mentioned in his bill to the People's Pure Ice Company was a valid agreement, which should be enforced in that suit. Exceptions taken to the master's report being filed, and argument had, the circuit court rendered a decree in favor of Trumbull and Cheverton, finding: That a parol lease of the premises was made, with a reasonable right of way over the rear or south end of said premises for ingress and egress, for the term of five years from January 1, 1891, at a rental of $50 per month, payable monthly in advance, and taxes, the premises being then vacant and unoccupied. That, under said agreement and parol lease, the said the People's Artificial Ice Company entered and with the knowledge and consent of said Purcell, erected and built a house, and therein placed machinery, a steam engine and boiler, a compressor, and other matters constituting a "plant" for the manufacture of artificial ice, of great value, and which were trade fixtures, which said ice company and its assign or assigns, and all other persons claiming from, by, through, or under it, were entitled to remove, and were capable of being detached, and, at the will of said ice company or its assigns, removed from said premises during said term, leaving said premises in the same condition as when entered upon by said ice company, doing no unnecessary damage to the freehold in effecting such removal. That, by reason of the premises, said agreement for a lease is taken out of the operation of the statute of frauds and perjuries, and that the said the People's Ice Company was, and said Rollin H. Trumbull and Edwin G. Cheverton, as its assigns, are, in equity and good conscience, entitled to a specific performance of said agreement and parol lease of the said premises hereinabove described and set out, for the said term of five years from the first day of January, A. D. 1891, upon the terms and conditions aforesaid, and upon payment of the rent at the rate aforesaid, for the month of July, 1891, to and including the month of May, 1892, to wit, the sum of $550, with interest on the same to date of payment from the 1st day of each of said months, as the same accrued. That the complainants Rollin H. Trumbull and Edwin G. Cheverton became, and were at the time of filing their bill of complaint herein, duly vested with all the said rights and property of the said the People's Artificial Ice Company, and in the possession thereof, until evicted therefrom, as alleged in their supplemental bill. That said Rollin H. Trumbull and Edwin G. Cheverton be let into possession of said premises, and remain in possession thereof until December 31, 1895, upon the payment into court of said sum of $550 and interest as aforesaid, for rent heretofore accrued, to abide the further order of the court as hereinafter provided, and upon continuing to pay the rent of $50 per month in advance for each month from the delivery or tender of possession under this decree to the end of such term, such payments of subsequent rent to be paid into court, to abide the further order of the court until there shall be satisfaction of any damages which may be awarded said complainants, as hereinafter provided. It is further ordered, adjudged, and decreed that said Trumbull and Cheverton are entitled to damages as against said Thomas Purcell, Richard B. Fuller, and the People's Pure Ice Company for such damages and loss as they may have suffered from deprivation of the possession and use of said premises and plant, and for any injury which has been caused to the machinery and plant during the time they have been deprived of the possession thereof; and that these causes are now referred to E. B. Sherman, Esq., master in chancery, to take and state an account of such damages, and report the same to the court with all proper dispatch; and that said Trumbull and Cheverton put in their evi-

dence within ten days from this date, and said defendants therein within ten days thereafter; and that said complainants close in rebuttal within three days thereafter; and that, upon the coming in of the master's report, application may be made thereupon for a further judgment, at the foot of this decree, in respect to such damages and as to the disposition of any money in court.

Upon reference to the master to take proofs of deterioration of the premises and damages for the detention, the master made his report of the testimony at great length,. and found that Trumbull and Cheverton were entitled to recover for damages and loss sustained by reason of being deprived of the plant and premises by Purcell and the People's Pure Ice Company the sum of $2,033.33, and for deterioration the sum of $2,500; making a total of $4,533.33. Upon hearing, the court affirmed the report of the master, and entered a supplemental decree in accordance with its recommendations. Trumbull and Cheverton in the meantime had determined that they did not want the premises, and asked the court to modify the decree so as to give them the value of the premises in damages, which value the referee found to be $20,000, in lieu of the premises themselves. But this the court refused to do. Both parties, being thus dissatisfied with the decree of the court, have brought these appeals, to have the decree reversed or modified to suit their views of the justice of the case. There is a great mass of testimony taken in the cases, both in the original reference and on that for the ascertainment of damages, and a great many facts not herein stated, but these may, perhaps, be considered sufficient for the purposes of this opinion.

William Burry and James E. Monroe, for appellants.
A. W. McDougald, for appellees.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge (after stating the facts as above). The principal questions discussed by counsel are: (1) Whether the evidence shows such a contract for an interest in real estate, followed by part performance upon the part of complainants in the original bill, as to take the case out of the statute of frauds, and entitle the complainants to a specific performance. (2) Is the action for specific performance barred by the judgment in the forcible entry and detainer suit? (3) Allowing that the complainants are entitled to have the contract for a five-years lease specifically performed, are they now, after the decree is entered as prayed for by them, entitled in equity to a decree for the payment of the value of the improvements put upon the premises by them, as damages in lieu of specific performance? There are some other minor questions presented by the record, but we think the case may be properly disposed of upon a consideration of these.

Upon the first and principal question, we are of opinion that the circuit court properly overruled the report of the master that the case of the complainants was barred by the statute of frauds, and that no case was made for a specific performance. On the contrary, we are of opinion that the evidence brings the case fairly within the leading cases and the great weight of authority on this subject, for specific performance of the agreement. All the requisites of such a case are fairly complied with. The weight of testimony shows an

oral contract for the execution and delivery of a lease for five years from January 1, 1891, of premises described with sufficient certainty, including all the terms of the contract, and the payment of specific rent. That it was the express understanding that such a lease should be executed and delivered appears from the testimony; that complainants were to enter into possession and build a valuable plant with machinery for the manufacture of ice, with the privilege of ingress and egress to and from the rear of the premises, they to pay all taxes and water rents, and $50 per month rent in advance, during the continuance of a five-years term. That Purcell so understood the contract up to the time he conceived the idea that an oral lease for five years was not binding, and that he might sell the lot, plant, and all to other parties, is also quite evident. His after-denial that the terms of any lease were agreed upon seems to be the result of his legal conception that a lease for five years without writing was void within the statute of frauds. It is clear from the evidence that he caused a lease for five years to be executed, containing all the requirements of the oral agreement, except that for ingress and egress and for a second term of five years upon a revaluation; and, upon complainants' refusal to accept the lease tendered, he promised to have others made, but never did. It is also clear that he permitted them to take possession, and that the improvements, costing about $30,000, were put on with his daily knowledge and implied consent, and that he even assisted in making the improvements for complainants. How little the case lacks of coming within the acknowledged rule for specific performance of an oral contract for an interest in land, accompanied by an entry into possession and the erection of valuable improvements with the grantor's knowledge and permission, will be seen by a brief reference to some of the many cases on this subject. To refuse relief in such a case would be to encourage fraud, which the statute requiring a contract for the sale of an interest in land for a longer time than one year to be in writing was passed to prevent.

The general rule is laid down by Story, as follows:

"In the next place, courts of equity will enforce specific performance of a contract within the statute where the parol agreement has been partly carried into execution. The distinct ground upon which courts of equity interfere in cases of this sort is that otherwise one party would be able to practice a fraud upon the other, and it could never be the intention of the statute to enable any party to commit a fraud with impunity. Indeed, fraud in all cases constitutes an answer to the most solemn acts and conveyances, and the objects of the statute are promoted instead of being obstructed by such a jurisdiction for discovery and relief."

The rule is well laid down very recently by the United States supreme court in Riggles v. Erney, 154 U. S. 244, 14 Sup. Ct. 1083, as follows:

"Indeed, the rule is too well settled to require further citation of authorities that, if the parol agreement be clearly and satisfactorily proven, and the plaintiff, relying upon such agreement and the promise of the defendant to perform his part, has done acts in part performance of such agreement to the knowledge of the defendant,—acts which have so altered the relations of the parties as to prevent their restoration to their former condition,—it

wòuld be a virtual fraud to allow the defendant to interpose the statute as a defense, and thus to secure to himself the benefit of what has been done in part performance. It must appear, however, that the acts done by the plaintiff were done in pursuance of the contract, and for the purpose of carrying it into execution, and with the consent or knowledge of the other party. While acts done prior to the contract or preparatory thereto, such as delivering abstracts of title, measuring land, drawing up deeds, etc., are not regarded as sufficient part performance, it is otherwise with such acts as taking open possession of the land sold, or making permanent or valuable improvements thereon, or doing other acts in relation to the land manifestly inconsistent with any other theory than that of carrying out the parol undertaking."

The same doctrine had previously been laid down in Railway Co. v. McAlpine, 129 U. S. 305, 9 Sup. Ct. 286.

The same rule has been often declared by the supreme court of Illinois, where the premises are situated, as may be seen from the following adjudged cases: Bright v. Bright, 41 Ill. 97; Kurtz v. Hibner, 55 Ill. 514; McDowell v. Lucas, 97 Ill. 489; Langston v. Bates, 84 Ill. 524; Bohanan v. Bohanan, 96 Ill. 591; Smith v. Yocum, 110 Ill. 142; Irwin v. Dyke, 114 Ill. 302, 1 N. E. 913; Morrison v. Herrick, 130 Ill. 631, 22 N. E. 537.

The principle is well stated by Lord Cottingham in Mundy v. Jolliffe, 5 Mylne & C. 167–177, as follows:

"Courts of equity exercise their jurisdiction in decreeing specific performance of verbal agreements when there has been part performance, for the purpose of preventing the great injustice which would arise from permitting the party to escape from the engagements he has entered into upon the ground of the statute of frauds, after the other party to the contract has, upon the faith of such engagement, expended his money, or otherwise acted in execution of the agreement. Under such circumstances, the court will struggle to prevent such injustice from being effected; and with that object, it has on the hearing, where the plaintiff has failed to establish the precise claims of the agreement, endeavored to collect, if it can, what the terms of it really were."

The supposition that a party would enter into possession of a vacant lot, and expend so large a sum of money in making permanent improvements, under a letting from month to month, is not to be indulged in, unless the proofs and circumstances make it necessary; but such improvements should be referred to an agreement for a longer term, if such agreement can be fairly found from the evidence.

This principle is laid down by Woodfall in his work on Landlord and Tenant (1st Am. Ed. 1890, vol. 1, pp. 165–167), as follows:

"The laying out of considerable sums of money by a person who enters under an agreement for a long term is rationally to be referred to such agreement, rather than to the mere tenancy at will, to be implied from such entry. After such expenses have been incurred on the faith of a lease agreed to be granted, it would be fraudulent and inequitable for a landlord to refuse to grant such lease."

We think this language not inapplicable to the case at the bar.

2. It is contended by Purcell and Fuller that the judgment in the forcible entry and detainer proceedings, and the refusal of the court to open that judgment, constitute a bar to this suit. But this contention cannot be maintained. The difficulty with it is the issues are entirely different. The issues here not only were not, but could

not have been, litigated in that action. That was an action at law to terminate the lease, not a five-year lease, but a letting from month to month, and recover possession for nonpayment of the monthly rent. The court treated the lease only as it existed at law, holding it to be tantamount to a letting from month to month, and properly refused to consider any larger equitable rights which the artificial ice company or Trumbull and Cheverton might have in the premises by reason of the contract with Purcell, expressly referring them to this suit already pending on the chancery side of the court for the ascertainment and protection of those rights. The judgment in that case was conclusive of all the issues depending therein. Those issues were whether the monthly rent had been paid when due, and, if not, whether the plaintiffs were not entitled to terminate the lease as it existed at law and to recover possession for such nonpayment. The issues here are quite different, involving, as they do, questions of strictly equitable jurisdiction. When the suit for forcible entry was commenced, two courses were open to the defendants. One was to pay the rent overdue, and stop the proceedings. The other was to apply to the court where this suit in equity for a specific performance was already pending, for an injunctional order staying proceedings in the case at law until the rights of the parties in equity should be determined. Nothing of this sort was done, but the defendants, after serving notice of appearance, made no defense, and judgment went against them by default. But it is quite clear that that judgment is not a bar to this suit. It terminated the lease, as the court held it to be a letting from month to month, and put the plaintiffs in possession; but it adjudged nothing in regard to the equitable right of the defendants to a specific performance, which they had prayed for in the suit already begun on the chancery side of the court. The rent due was afterwards tendered by Trumbull and Cheverton, and a demand for possession made, which were both refused.

3. The contention of the complainants that they are entitled to a decree for the value of the plant as damages in lieu of specific performance is untenable, and must be denied. They get by the decree what they prayed for, and, we think, all they are entitled to receive under the evidence.

The evidence on the question of damages resulting from user and deterioration is quite conflicting, the witnesses disagreeing very much in their estimates; but we cannot say that the amounts reported by the master and adopted by the court are not fairly sustained by the weight of evidence. But we think that these damages, covering the entire period, should only have been assessed against Purcell and Fuller. They should be held responsible in equity from being the actuating cause of the complainants being denied their equitable rights under the contract, and being put out of the possession to which they were equitably entitled thereunder. But we are unable to see how the defendant the People's Pure Ice Company, being a corporation, can be held for damages accruing before it was organized or went into possession of the plant. It would be

liable, no doubt, for damages accruing after it went into possession, but these, not having been separately assessed by the master, cannot now be assessed without a further reference.

The decree of the circuit court will be affirmed in all things except as to the decree for damages against the People's Pure Ice Company, and as to those damages it will be reversed, with leave to the complainants, if they so choose, to take a further reference to a master to ascertain the proper proportion of the damages sustained for the time that company was in possession, in which case, upon the return of the master's report and confirmation thereof, a further decree may be entered against the People's Pure Ice Company for the damages so assessed.

The foregoing opinion was afterwards modified as appears below:

(November 13, 1895.)

BUNN, District Judge. In this case there is a motion by complainants to modify the decree in respect to damages against the People's Pure Ice Company, and also so as to require a further reference to ascertain damages to the plant accruing since the decree was entered. We think the decree should be modified in the first particular named, and the motion overruled as to the last.

We think the entire damages assessed for use and occupation covering the period from May 11, 1892, when Fuller and Purcell went into possession, up to May 23, 1894, the day after the entry of the decree, should only have been assessed against Fuller and Purcell, and not against the People's Pure Ice Company, which did not go into possession until August 28, 1892,—3 months and 17 days after the termination of the forcible entry and detainer action, when Fuller and Purcell took the plant. But, as the basis of estimating these damages was the interest upon the assessed valuation of the plant, there is no difficulty in determining from data contained in the record the proportion of these damages properly chargeable to the People's Pure Ice Company.

The damages for use and occupation assessed by the master and allowed by the court were determined by reckoning the interest at 5 per cent. upon a valuation of $20,000 from May 11, 1892, to May 23, 1894, a period of 2 years and 12 days, and amounting to the sum of $2,033.33. The People's Pure Ice Company was organized on June 28, 1892, for the purpose of running the plant, but did not take an assignment of the lease or go into possession until August 28th, and so should not be chargeable for use during that interval. The interest upon that sum at 5 per cent. from May 11th to August 28th,—3 months and 17 days,—amounting to $297.22, being deducted from $2,033.33, leaves $1,736.11 as the proper amount with which the People's Pure Ice Company should be chargeable.

As to the $2,500 decreed against all the defendants on account of damages from deterioration, there is no difficulty in affirming the decree as to the People's Pure Ice Company as well as the other defendants, because those damages, according to the master's report and all the testimony, arose from the shutting down of the

plant on or about November 1, 1892, and allowing it to remain unused for a period of some 18 months, up to May 22, 1894. There is no evidence tending to show that any part of these damages accrued between May 11 and August 28, 1892, before the People's Pure Ice Company went into possession.

The decree will be affirmed in all things except as to damages for use and occupation assessed against the People's Pure Ice Company from May 11 to August 28, 1892, and in respect to these the decree as against the People's Pure Ice Company should be modified by deducting the sum of $297.22 from the aggregate sum allowed by the decree for damages.

The motion for a further reference to a master to ascertain damages sustained to the plant since the entry of the decree will be overruled. Supposing that might be done in any case (a question we do not determine), the decree in this case gave the complainants the right to the possession. The bond given on appeal was not a supersedeas bond, but only for costs; and, if complainants have not taken possession, it is only because they did not wish to do so.