Argued 2 October; decided 21 October; rehearing denied 16 December, 1901.

## SCOTT *v.* LEWIS.

[66 Pac. 299.]

EFFECT OF NOTICE OF OUTSTANDING EQUITIES.

A purchase-money mortgagee, who voluntary releases the mortgage and takes a reconveyance of the mortgaged premises, knowing, or having the means of knowing, that the mortgagor has executed a bond for title therefor, takes the property subject to the equity so created, in the absence of accident, fraud, or mistake; and the holder of such a bond may enforce it against all persons knowing or being chargeable with notice of his claims.

From Yamhill: REUBEN P. BOISE, Judge.

Suit by C. A. Scott against Joseph R. Lewis. From a decree in favor of plaintiff, defendant appeals. AFFIRMED.

For appellant there was a brief over the name of *Cotton, Teal & Minor,* with an oral argument by *Mr. Wirt Minor.*

For respondent there was a brief over the name of *Ramsey & Fenton,* with an oral argument by *Mr. William M. Ramsey.*

Mr. Justice Moore delivered the opinion of the court.

This is a suit in the nature of a cross bill to enjoin proceedings in an action at law and to compel the execution of a deed to certain real property.    The transcript shows that on April 18, 1892, one James M. Scott secured the possession of lots numbered 11, 12, 13, 14, 17, 19, 20, 21, 22, and 25, in Oaks Fruit Farm, Yamhill County, Oregon, containing sixty-eight and thirty hundredths acres, under a contract with the defendant, by the terms of which he was to pay one third of the purchase price in six months, and the remainder in one, two, and three years, it being stipulated that upon the payment of the first installment he was to receive a deed to the premises, and give a mortgage thereon to secure the promissory notes evidencing the deferred payments, in pursuance of which the deed and mortgage were duly made on October 27, 1892, and July 25, 1893, respectively, but they were not recorded until November 1, 1893.  Scott having offered to give his son, the plaintiff herein, five acres of said land if he would move thereto from Nebraska and build a house thereon, the latter, in pursuance thereof, made the journey with his family to this state, whereupon his father, in April, 1893, gave him possession of said lot 20, containing five and forty-five hundredths acres, upon which he erected a house, barn, and other buildings, put down a sidewalk, built some picket fence, dug a well, and set out some berries and fruit trees, expending thereon and in traveling about $480; and on April 19, 1894, received from his father a bond for a deed, containing a covenant to convey said lot by a good and sufficient deed at any time within five years, upon the payment of $25, being the consideration for the land received in excess of that promised.  Default having been made in the payment of said promissory notes, James M. Scott, on August 25, 1897, executed to the defendant a quit-

claim deed of all his interest in said lots, receiving as a consideration therefor a surrender of said notes, a release of the mortgage, and an option to purchase, at any time before January 1, 1898, said lots 20, 21, and 26 of said tract for the sum of $1,100, of which $300 was to be paid within the time specified, whereupon he was to receive a deed therefor, and give a mortgage thereon to secure promissory notes of $500 and $300, payable in one and two years, respectively; and it was stipulated that upon the payment of $200 on account of the mortgage—thus making a cash payment of $500—the defendant was to release lot 20 from the lien of said mortgage. The plaintiff thereafter filed said bond for a deed to lot 20 for record, and, refusing to surrender possession, the defendant commenced an action against him therefor. An answer was filed therein, in which it was averred by the plaintiff herein that he had a full and complete defense to the complaint in equity, but not in law, and with said answer filed the complaint herein, alleging in part the facts hereinbefore stated, and averring that at the time defendant accepted said quitclaim deed he had full knowledge and notice that the plaintiff was in the actual, visible, exclusive, and adverse possession of said lot 20, claiming to be the owner thereof; that within the time specified therefor he tendered to the defendant the sum of $25, and demanded a deed for said lot, but, the defendant having refused to comply therewith, he deposited said sum with the clerk for him. The answer denies the material allegations of the complaint, and avers that the deed executed by the defendant and James M. Scott's mortgage were simultaneously delivered, and that the plaintiff took whatever interest he secured in said lot with knowledge and notice of the defendant's rights thereto. The reply having put in issue the material allegations of new matter in the answer, a trial was had, resulting in a decree as prayed for, and the defendant appeals.

It is contended by defendant's counsel that the security given by James M. Scott was a purchase-money mortgage, which, having been delivered in exchange for the deed, the lien thereby created is paramount to any equitable estate in the

mortgaged premises arising by, through, or under the mortgagor, and hence the court erred in the decree complained of. We think the point insisted upon is without merit, for the defendant, having intentionally satisfied the mortgage, necessarily rendered the said lots liable to the equities imposed upon them by the mortgagor while the legal title was vested in him. If James M. Scott, for a valuable consideration, had conveyed any or all of these lots during the time he held the legal title, the purchaser thereof, upon recording his deed, would have taken an estate in the premises superior to the defendant's mortgage when the lien thereof was discharged. The object of recording acts is to furnish notice to intending purchasers of real property of the condition of the title and of the names of the persons in whom it is vested. Such notice is imparted, however, in the absence of a recorded deed, if the intending purchaser sees a stranger to the title in open, notorious, and exclusive occupation of the premises claimed by the pretending vendor, who, from the record, appears to hold the legal title, and fails to inquire of the person so in possession what right he claims in the premises. He is chargeable with such notice as a truthful answer to the inquiry, if propounded, would elicit: *Exon* v. *Dancke*, 24 Or. 110 (32 Pac. 1045). Equity protects a parol gift of land if the donee, induced thereby, takes possession of the premises, or makes valuable improvements thereon: *Barrett* v. *Schleich*, 37 Or. 613 (62 Pac. 792); *Bakersfield, etc. Assoc.* v. *Chester*, 55 Cal. 98; *Irwin* v. *Dyke*, 114 Ill. 302 (1 N. E. 913); *Story* v. *Black*, 5 Mont. 26 (1 Pac. 1, 51 Am. Rep. 37). The testimony shows that the plaintiff, induced by his father's offer to give him five acres of land in this state, moved thereto from Nebraska, and settled upon the lot in question, upon which he made valuable improvements, in pursuance of and while relying upon his father's representation that he would give him a deed to the property if he would build a house thereon. Such a performance of the parol agreement would undoubtedly be sufficient to entitle the plaintiff to a specific performance of the contract in a suit instituted for the purpose against his father, if he

were the holder of the legal title: *Barrett* v. *Schleich,* 37 Or. 613 (62 Pac. 792). The plaintiff having only an equitable estate in the lot at the time his father executed said quitclaim deed, it remains to be seen whether the defendant's knowledge of the plaintiff's possession and improvement of the lot is sufficient to put a reasonably prudent person upon inquiry, which, if prosecuted with ordinary diligence, would create a presumption that the search, if prosecuted, would have resulted in ascertaining the extent of the estate claimed in the premises. If this inquiry is answered in the affirmative, it follows that the contract can be enforced against the defendant, notwithstanding the plaintiff was in possession of the lot under an unrecorded agreement with the owner to purchase the same: *Moss* v. *Atkinson,* 44 Cal. 3; *Hyde* v. *Mangan,* 88 Cal. 319 (26 Pac. 180).

James M. Scott, as plaintiff's witness, testifies that in the spring of 1896, at Seattle, Washington, he informed the defendant that his son had settled upon said lot, and that he had invested all the money that he possessed in making the improvements thereon; and the witness, having paid quite a sum on account of the purchase of the lots, requested the defendant to execute to the plaintiff a deed to lot 20, which he refused to do. The plaintiff, as a witness in his own behalf, corroborates his father in this respect, saying that he was present on that occasion, but took no part in the conversation. The plaintiff's wife testifies that on August 19, 1897,—about a week before the quitclaim deed was executed,—the defendant visited the lot in question, saw the improvements which had been made thereon, and informed her that he expected to make some settlement with her father-in-law in respect to the money which he owed him, intimating that he might accept a conveyance of the premises. She told the defendant that her husband, who was then absent, had put all his money into the improvements made upon the place, whereupon he informed her that, if he took the land back, he would give them an opportunity of retaining their home. The plaintiff, upon his return, wrote the defendant as follows:

"Dayton, Oregon, Sept. 24, '97.

"*Mr. Lewis*—

"Dear Sir: On returning from British Columbia, I learn that father had deeded back the property to you, and that I also understood from my wife that I could have my wood or anything that we had individually on the place. Of course, I do not mean the buildings, or any line fences or permanent fixtures on the place. All that I thought that I was at liberty to take was some wood that I had cut; and I had borrowed and bought $250 worth of wire that I had strung temporarily through the timber to keep Mr. Rowley's stock from getting into the grain. The wire was not on the line, and that it was partly on the piece of land that Mr. Rowley had lately bought, and partly on your land. I had no thought of any trouble when I took the wire off, supposing that I was at liberty to take it, as over half the wire was only borrowed. I had contemplated buying lot 25, adjoining 20 at the lower end, but I have been informed that you had threatened to put me off the place. Let me hear from you as soon as possible, so that, if you insist on our leaving the place, I shall have to look elsewhere for a home. I want to hear from you directly; then I shall know. I have returned the borrowed wire, and the remaining portion is on our place. If you want me to pay you for the wire I can do so. Yours respt.,

"C. A. Scott."

This letter, having been received after the quitclaim deed was executed, can have no effect in determining the rights of the parties, except, possibly, to show the plaintiff's previous intention in respect to claiming lot 20. In explaining the contents of the letter, he testifies that when it was written he had no knowledge of his rights in the premises. Having ascertained that his father had conveyed all his interest in the lots to the defendant, and knowing that he had no deed for lot 20, he may have reasonably supposed that his rights therein were extinguished. While the maxim, "*Ignorantia juris non excusat,*" would probably bar his securing the title to said lot by a suit in equity against the defendant, on the ground of estoppel, if his letter had been received before his father's quitclaim deed was delivered and the mortgage released, such result cannot follow in the present instance, because the de-

fendant neither relied nor acted upon the information con-
tained in the latter.

The testimony shows that James M. Scott is a minister of
the gospel, and that his duties kept him employed in the State
of Washington, so that he never resided upon said lots, though
he visited the premises about three times after his son settled
thereon, remaining a few days each time. At the time the quit-
claim deed was executed, the plaintiff, though absent, was in
possession of all the other lots as the tenant of his father, but
the testimony does not disclose when such tenancy began. The
plaintiff's wife did not inform the defendant that her husband
claimed any estate in the premises, nor did his father impart
any information of that character when he executed the quit-
claim deed; and, while they are related to the plaintiff, they do
not appear to have been his agents. The option having been
granted to his father would seem to rebut any inference of
agency, while the defendant's written agreement to release lot
20 from the lien of the mortgage to be placed thereon, if the
option were exercised, tends to show that the defendant knew
that the plaintiff had some equitable claim thereon. We do
not understand that it was incumbent upon the plaintiff's
wife, who did not claim to be the owner of any interest in lot
20, to notify the defendant of her husband's claim thereto,
but that, the defendant having having found her in possession
thereof, in the absence of her husband, the duty of making
inquiry in respect to any equitable claim thereto was imposed
upon him. As was said by Mr. Justice COLE in *Dickey* v.
*Lyon,* 19 Iowa, 544: "A person who purchases an estate in
the possession of another than his vendor is, in equity—that is,
in good faith—bound to inquire of such possessor what right
he has in the estate. If he fails to make such inquiry, which
ordinary good faith requires of him, equity charges him with
notice of all the facts that such inquiry would disclose." It
will be remembered that James M. Scott was the holder of the
legal title, and hence the plaintiff was a stranger thereto, and
his possession and improvement were sufficient, in our judg-
ment, to attract the attention of a reasonably prudent man,

and cause him to make inquiry, which, if prosecuted, must necessarily have resulted in knowledge of plaintiff's equity, and for this reason the defendant is chargeable with notice: *McDougal* v. *Lame,* 39 Or. 212 (64 Pac. 864).

It is contended by defendant's counsel that the plaintiff does not offer to do equity by paying the purchase price of the land, and hence the decree should be reversed. When plaintiff's father conveyed his interest in the lots to the defendant, who voluntarily canceled the mortgage, the legal estate and lien became merged in him. If, however, he was induced by accident, fraud, or mistake to cancel the mortgage in ignorance of the facts, a court of equity would have restored his lien: *Pearce* v. *Buell,* 22 Or. 29 (29 Pac. 78); *Kern* v. *Hotaling,* 27 Or. 205 (40 Pac. 168, 50 Am. St. Rep. 710); *Capital Lum. Co.* v. *Ryan,* 34 Or. 73 (54 Pac. 1093); *Rumpp* v. *Gerkens,* 59 Cal. 496; *Shaffer* v. *McCloskey,* 101 Cal. 576 (36 Pac. 196). He had an opportunity to present this question, but neglected to make it an issue, and, having to failed to ask for equitable intervention, and relied upon the title conveyed by the quitclaim deed, it follows that the decree is affirmed.

AFFIRMED.