Argued March 30, affirmed November 23, 1955, petition for re-
hearing denied February 15, motion to stay mandate
allowed February 25, 1956

SCHAFER ET AL *v.* FRASER ET UX

290 P. 2d 190
294 P. 2d 609

*Harlow F. Lemon,* Portland, argued the cause for appellants. On the briefs were Maurice C. Corcoran, James P. Cronan, Jr., and Schafer, Holbrook & Cronan, Portland.

*Jonathan Edwards,* Portland, argued the cause for respondents. On the brief were Collier, Bernard, Bernard & Edwards, Portland.

ROSSMAN, J.

This is an appeal by the plaintiffs from a judgment of the circuit court which denied the relief sought by the complaint and granted the defendants judgment against the plaintiffs in the sum of $12,418.26 upon a counterclaim. The judgment was entered after verdict by a jury.

The plaintiffs-appellants, two in number, as partners, are engaged in the practice of law. The defendants-respondents, who are husband and wife, operate a farm upon Sauvies Island near Portland which produces as its principal yield beef cattle. The appellants, as associates of another firm of attorneys, Hicks, Davis & Tongue, which represented the respondents, performed professional services for the respondents in the trial of a case. The latter was instituted by the respondents against the Aluminum Company of America in the United States District Court at Tacoma upon a claim that fluorine gases escaped from a plant of the Aluminum Company located at Vancouver, Washington, and drifted across the Columbia river to farms on Sauvies Island, including the farm of the

respondents, thereby poisoning the forage and causing the grazing cattle to become afflicted with a malady. The trial of the case resulted in the entry of a judgment in favor of the respondents and against the Aluminum Company in the amount of $60,000.

According to the complaint which was filed in the case at bar, the appellants expended for the respondents in the trial of the fluorine poisoning case $3,127.34 for which they received no reimbursement, except $59.27. Judgment was sought for $3,068.07. The answer denied the asserted indebtedness. As a counterclaim, it declared that when the appellants' services were engaged as associate counsel, the appellants, as attorneys, represented many other farmers on Sauvies Island who asserted claims against the Aluminum Company similar to that of the respondents. Continuing, the counterclaim alleged that the appellants' other farmer clients had an interest in common with the respondents in establishing the basic, or initial, liability of the Aluminum Company for the escape of the fluorine gas and the poisoning thereby of the forage. The counterclaim averred that the appellants, as attorneys for their other clients on Sauvies Island, promised on their behalf that they would share pro rata in bearing the expenses incurred in establishing the liability just mentioned and represented that the appellants possessed authority from their other clients to make those promises. Further, the pleading affirmed that, contrary to their assertions, the appellants had no authority to make for their other clients the agreement for sharing the expense of establishing the Aluminum Company's basic liability. It averred that, in reliance upon the appellants' promises, the respondents spent more than $26,000 in establishing the liability of the Aluminum Company for the fluorine poisoning, and

that, due to the fact that the appellants had no authority to make on behalf of their other clients the agreement just mentioned, the respondents were damaged in the amount of $18,200. After the completion of the respondents' trial against the Aluminum Company, the appellants made settlements, so the counterclaim states, of the claims of their other clients in the total sum of $140,000. The counterclaim sought judgment against the appellants for $18,200. The verdict and its resulting judgment granted the appellants nothing, but sustained the counterclaim to the extent of $12,418.26.

The first of the assignments of error follows:

"The Court erred in refusing to dismiss the counterclaim on the ground that it failed to state facts sufficient to constitute a cause of action."

We will now consider that assignment of error. In support of it, the appellants advance these contentions:

"1. No consideration was pleaded for the contract alleged in the counterclaim."

"2. The counterclaim states no legal claim for damages, and the facts pleaded therein prove that, as a matter of law, respondents suffered no damages."

The record shows that by 1948 the respondents became convinced that fluorine gases escaped from the Vancouver plant of the Aluminum Company of America, drifted across the Columbia river to Sauvies Island and poisoned the forage upon which their cattle fed. About that time they consulted Mr. E. F. Bernard, a member of the Portland bar, in regard to their difficulty. Up to that time no case had ever gone to judgment in an American court based upon a claim that fluorine gas escaping from an aluminum reduction plant had caused the poisoning of grazing livestock

and, hence, the problem which the respondents brought to Mr. Bernard was not elucidated by American precedents. After Mr. Bernard had become satisfied that the respondents' case possessed merit, he conferred with the appellants, who represented other farmers along the lower Columbia river valley in the prosecution of claims similar to that of the respondents, and later recommended to his clients that they employ the appellants as associate counsel. The recommendation was accepted. In March, 1949, Mr. Bernard and the appellants filed, on behalf of the respondents, an action against the Aluminum Company in the United States District Court at Tacoma, seeking damages in the sum of $300,000 upon charges that fumes from the Aluminum Company's plant caused the respondents to suffer damages to both livestock and land. Later, as attorneys for three other farmers on the island, the appellants filed cases similar to that of the respondents. The appellants represented twelve farmers on Sauvies Island, in addition to the respondents and the three just mentioned, all of whom asserted claims arising out of the escape of fluorine gas from the Aluminum Company's plant. Mr. William Nash, a member of the Portland bar, represented another farmer on the island who had a claim similar to that of the respondents.

In the early part of 1950 the respondents' case was assigned to June 5, 1950, for trial. In March of 1950 ill health compelled Mr. Bernard to withdraw as counsel from the case and thereupon the appellants, in order to afford the respondents opportunity to secure counsel of their own choice, also withdrew. At that juncture, the respondents retained as counsel the aforementioned firm of Hicks, Davis & Tongue. That firm, persuaded by the same reasons which had influenced Mr. Bernard, told the respondents that they ought to

employ the appellants as associate counsel. The advice was followed and the appellants again entered the case.

Although the respondents' case against the Aluminum Company was set for June 5, the trial of the other three cases in which the appellants were counsel was deferred to the fall of 1950. An effort of the appellants to induce the court to consolidate the four cases for trial failed. Accordingly, the respondents' case was the first of the group which was scheduled for trial, and became regarded as a test case.

As the day of the trial drew near it became apparent that the presentation of the case would necessitate the expenditure by the respondents of large sums of money. In addition to the normal expenditures, such as those for a court reporter and a daily transcription of the testimony, the expenses, as anticipated, would consist in part of payment for expert witnesses, railroad fares, hotel bills and photographic services. One item of evidence indicates that the transcription of testimony cost $3,774.15. Another item shows payment to a photographer of $888.47. We have mentioned the fact that the place of the trial was Tacoma. That circumstance required the respondents, their attorneys and witnesses to travel to Tacoma and stay in hotels. Some of the witnesses were in attendance for the entire ten weeks of the trial. The respondent, William Fraser, testified that the hotel bill was not less than $2,457.44, not including anything for his wife, son and himself, all three of whom testified. Although the sums just mentioned were sizeable, they were by no means the heaviest which a litigant would have to incur who proposed to prove that the Aluminum Company was responsible for the ill condition on Sauvies Island about which the farmers were complaining. In order to succeed, a plaintiff would have to prove that (1) the

Aluminum Company's plant created fluorine gas; (2) notwithstanding the precautions taken by the company, fluorine gas escaped from the plant; (3) the noxious gas drifted across the Columbia to Sauvies Island; (4) the gas settled upon and impregnated the forage on the island in sufficient quantities to be harmful to the beef and dairy herds; and (5) the malady which was evident in the herds was due to the fumes which were emitted by the Aluminum Company's plant.

It is evident that, in order to establish the facts mentioned in the preceding paragraph, the services of chemical engineers and veterinarians would be required. The chemical engineers would have to examine the aluminum reduction plant and the veterinarians would have to examine the livestock.

The appellants had been engaged, prior to their employment in the respondents' case, in the successful representation of farmers who lived near the Troutdale aluminum reduction plant of the Reynolds Metals Company. Those farmers had claims similar to that of the respondents and in representing them the appellants had learned, not only the applicable legal principles, but, also, the witnesses who could avouch for the needed facts. It was on account of the familiarity of the appellants with the needs of the case that both Mr. Bernard and Mr. Tongue had recommended that the appellants be retained as associate counsel. We pause to observe that when the case got under way Mr. Hicks performed the trial work. However, both Mr. Tongue and the appellant Cronan rendered the needed ancillary services.

We return to the expenses which preparation for the trial showed the respondents would have to meet. Mr. Cronan, in order to prove that fluorine gas was created in the Aluminum Company's plant, employed

two chemical engineers who made an examination of the plant and testified at the trial. Before going on to other anticipated expense items, we take note of the fact that the two chemical engineers, shortly after the close of the trial, sued the respondents for $14,650 for their services. Settlement was made for $7,950. Other experts chosen from the veterinarian profession examined the herds in the vicinity of the Aluminum Company's plant and dissected the carcasses of animals which were deemed victims of fluorine poisoning. These veterinarians practiced in the cities along the lower Columbia river valley where aluminum reduction plants operate. One witness of that kind, who was deemed pre-eminent, came from Ithaca, New York.

The facts above noted indicate that, as the difficulties of the case came into clear view with the approach of the day of the trial, it was seen that a costly trial awaited the respondents. The appellants foresaw from their experience in the Reynolds Metals case that the trial would require a large outlay of money and so told the respondents. Obviously, they had an interest, personal to themselves, in making certain that the first case would be well presented, for the other fifteen claims which they represented would be largely governed by the outcome of this case. In view of the fact that the fees in the respondents' case were contingent, it may be that the charges which the appellants could make against their fifteen other clients were also contingent upon success. By making that statement we intend no disparagement of the appellants' fidelity to the respondents. The appellants foresaw that a successful outcome of the respondents' case might simplify the trial of the remaining cases and assure victory in them. For instance, after the entry of judgment in the respondents' case, the appellants

sent each of their fifteen clients on the island a letter which stated:

"* * * if the court will extend to our plaintiffs the benefit of his adjudication in the Fraser case that fluorine did escape from Alcoa's plant and did cause damage, then our plaintiffs will be saved the expense of proving that part of the case."

Upon the trial of their next case the appellants offered in evidence the record in the respondents' (Fraser's) case.

When the respondents realized that they faced an expensive trial, several alternatives were available to them. Among them were:

■ Apply to the court for a voluntary nonsuit.

■ Apply to the court for a postponement of the day of trial and hope that some other litigant would establish the basic or initial liability of the Aluminum Company and thereby enable the respondents to effect a favorable settlement of their claim.

■ Seek to persuade the court that the expenses of a trial would be too great for any one litigant to bear alone and, therefore, it ought to reconsider the respondents' motion for a consolidation of the four pending cases.

■ Try to effect with some other claimant, such as the one represented by Mr. Nash, an agreement for the sharing of litigation expenses.

■ Try to effect with the claimants represented by the appellants an agreement whereby all would bear pro rata the expense of establishing the initial liability of the Aluminum Company for the poisoning of the forage.

■ Effect by voluntary agreement a settlement of the respondents' claim even though the Aluminum

Company paid nothing more than the nuisance value of the case.

■ Eliminate some of the expensive features of the case, thereby reducing the cost of the trial.

■ In lieu of seeking damages to both the land and the livestock, ask for one of them only and by that means reduce the length and expense of the trial.

Possibly some of the alternatives just mentioned were impractical, but, nevertheless, it is apparent that the respondents were not forced to proceed with their case. In making that statement, we have not overlooked the fact that the respondents were anxious to have their case tried, and that appellant Cronan warned them that the trial would be costly. But, in that connection, we think it must be borne in mind that evidence, which the jury apparently accepted as truthful, shows that both Mr. Bernard and respondent William Fraser had instructed the appellants not to incur any expenses without their express approval, and that similar testimony indicates that Mr. Fraser instructed Mr. Cronan not to employ the chemical engineers whom we have mentioned. The record also shows that in deciding to go ahead, the respondents depended upon the agreement which is manifested by the letter of June 3, 1950, which we will presently quote.

Faced with the problem of how to relieve the respondents of the heavy burden of expense threatened by the approaching trial, Mr. Tongue selected the fifth of the above alternatives. He thereupon sought to effect, through the appellants, an agreement whereby the other island clients of the appellants would share, upon a pro rata basis, the cost of establishing the initial or basic liability of the Aluminum Company. By initial liability Mr. Tongue meant the responsibility

of the Aluminum Company for the escape from their plant of fluorine gas and its deposit on the island's forage in such quantities that the herds which grazed there became diseased. In the term initial liability he did not include the expense of proving the peculiar damage of any individual farmer.

Proposals for a sharing of the expense of conducting the impending trial had been made before Mr. Tongue interested himself in the subject. For example, March 1, 1950, appellant Cronan wrote to Mr. Bernard regarding a veterinarian whom Mr. Cronan proposed to employ, not only in the respondents' case, but also in other cases which the appellants were prosecuting, at an expense "of perhaps $1500". His letter then added: "I would assume Mr. Fraser would bear his share in view of the time to be spent on his case in relation to the others." On October 21, 1949, Mr. Cronan, according to the respondent William Fraser, spoke to him concerning the two chemical engineers whom we have mentioned and, after stating that each would charge $4,000 to examine the plant of the Aluminum Company for the purpose of determining whether fluorine gases were emitted, "wanted to know if I would pay part of it." One of the farmers on the island by the name of Cashdollar testified that when, sometime before the trial of the respondents' case, he observed photographers take pictures of his livestock and veterinarians made examination of his cattle, he became anxious about the expenses and went to Mr. Cronan for an explanation. Mr. Cronan told him, so Cashdollar swore, that the expenses would be pro rated among all of the claimants. The appellants admit that a pro rating of costs was effected concerning the services of one Ray Maiers. Thus, it was recognized, almost from the day when the respondents instituted their

case, that since there were many claimants whose demands paralleled those of the respondents, an agreement would be just which cast the expense of establishing the basic liability of the Aluminum Company upon all of the claimants. Since the appellants would derive a marked advantage through the establishment of the Aluminum Company's liability, they, naturally, were interested in seeing to it that the cost of the expensive test case would surely be financed.

The respondents presented evidence which showed that Mr. Tongue, as their agent, and the appellants, as agent for their other clients, entered into an oral agreement on or about June 2 which provided that the appellants' other clients would bear pro rata with the respondents the cost of establishing the initial liability of the Aluminum Company. The pro rata share which each farmer was to bear, according to the agreement, would be determined by comparing the damages which he received with the total amount recovered by all. The respondents were awarded a judgment for $60,000, and the other fifteen clients of the appellants later settled their claims through the appellants for a total of $140,000. The appellants concede that they had no authority from their clients to effect the agreement upon which the respondents rely.

Mr. Tongue testified that on or about June 2 he discussed with Mr. Cronan a proposal whereby the appellants' clients on the island would help bear the expenses which the respondents were about to incur. Refering to Mr. Cronon, he testified:

"* * * we sat down with Mr. Cronon, or rather, I believe it was I that sat down with Mr. Cronan, and worked out with him an understanding under which—while it was understood that Mr. and Mrs. Fraser would have to advance a large

part of the money necessary to finance the trial of the case, it was to be understood that this was really a test case to establish liability for the benefit of all of the farmers on Sauvies Island.

\* \* \* \* \*

"Those questions going to establish liability and the responsibility of the company for damage to the cattle and the fact that cattle were damages, those expenses, going to those basic questions, for the benefit of all of the farmers, would be pro rated at the conclusion of all of the cases. So, that depending upon the amount of recovery by the various farmers, each one would bear his pro rata share of the expenses that were incurred in this initial test case to establish that liability.

"It was also understood that expenses that were incurred to establish the amount of damages to Mr. Fraser and his herd, that resulting from the necessity of calling cattle experts and appraisers to testify to the amount of his particular damage, that those expenses would be borne solely by him. But, that the expenses going to the basic question of liability, which were considered to be for the benefit of all of the farmers were to be pro rated."

Mr. Tongue testified that Mr. Cronan acquiesced in the understanding which he described in the foregoing testimony. He went on as follows:

"And that was the conversation that I had with Mr. Cronan, and, I believe that it was very shortly, probably the next day, after that conversation that I dictated the letter dated June 3rd."

It is evident from the record that the conversation which Mr. Tongue related occurred June 1, 2 or 3. The trial opened June 5. We will presently quote the letter of June 3 to which Mr. Tongue referred, but before doing so will turn to Mr. Cronan's testimony for the purpose of obtaining his version of the con-

versation depicted by Mr. Tongue. The following is taken from Mr. Cronan's direct examination:

"Q You heard Mr. Tongue testify that he had a conversation with you relative to those expenses sometime in—either on June 2nd or could even have been the morning of June 3rd?

"A Yes. And, if that is Mr. Tongue's testimony here I would be inclined to agree. I don't remember.

"Q You don't recall any such conversation?

"A Not of my own recollection, no. If he said there was a conversation, I would agree with him. He probably remembers it better than I do."

Upon cross-examination, when Mr. Cronan's attention was directed specifically to Mr. Tongue's above-quoted testimony, he gave the following testimony:

"A I was here when Mr. Tongue testified.

"Q You heard his testimony?

"A Yes. And I am inclined to think he is probably right.

"Q You think he is probably right?

"A Right."

June 3, 1950, when Mr. Cronan was in Mr. Tongue's office participating in the preparation of the case for trial, Mr. Tongue handed him the letter which he mentioned in his above-quoted testimony. It was signed by Hicks, Davis & Tongue, dated June 3, 1950, and addressed to Mr. Cronan. Apart from formal details, the letter read as follows:

"Dear Jim:

"This will confirm our understanding that although Mr. Fraser may be required to make further advances toward the costs and expenses incurred in the preparation and trial of this case, there will later be an adjustment between himself and the

other clients represented by your firm and by ourselves with similar cases on the following basis:

"1. Mr. Fraser is to bear the expense of all appraisers and cattle experts called for the purpose of establishing the amount of the past damages suffered by him, including loss of profits, and the extent of the depreciation in market value of his property.

"2. Other costs and expenses, including the expenses and fees of Dr. Udall and of other witnesses used for the purpose of establishing initial liability upon Alcoa for damage to cattle on Sauvies Island, including plaintiffs' cattle, will, upon final disposition of all of the cases involved, be pro rated between the various clients upon the basis of actual recovery.

"This will also confirm our understanding that in view of the fact that Mr. Fraser and Mr. Hall have already made advances in excess of $1500, you will make arrangements for substantial advances on behalf of your clients to defray such portions of the costs and expenses involved in the trial of this case as are to be pro rated, as set forth above.

Yours very truly,

Hicks, Davis & Tongue
By Thomas H. Tongue, III."

The evidence indicates that before the letter was handed to Mr. Cronan it was shown by Mr. Tongue to the respondents, who approved it. The respondent, William M. Fraser, manifested the approval by writing his initials upon the letter. Mr. Cronan acknowledged that the letter was handed to him and said that he read it. He used the word "hurriedly" when he admitted that he read it. He conceded that when he received the letter he made no intimation that it did not reflect the agreement which he and Mr. Tongue

had effected. Likewise, at that time he gave no inkling that he lacked authority from his clients on the island to agree for them upon a pro rata sharing of the litigation expenses.

The letter just described and dated June 3, 1950, was handed to Mr. Cronan on the date it bore, June 3, 1950, a Saturday. The next day, Sunday, Mr. Cronan and Mr. Tongue rode together in an automobile to the Portland depot where they boarded a train for Tacoma. Mr. Cronan acknowledged that he said nothing to Mr. Tongue about the letter while the two were in the car and that he made no intimation that the letter did not express their agreement or that he lacked authority from his clients to have agreed for them upon a pro rating of trial expenses. The two attorneys rode together on the train to Tacoma and during the ride, as Mr. Cronan freely admitted, he said nothing about the letter or the agreement which it undertook to express. For the next ten weeks while the trial progressed, Mr. Cronan worked closely with both Mr. Tongue and Mr. Hicks, but, according to him, he said nothing about the letter and the agreement which it evidenced until the plaintiffs in that case (respondents here) had rested their case and a witness by the name of Dr. Phillips was testifying for the defendant (Aluminum Company). Before taking note of that incident, we deem it pertinent to mention that both Mr. Tongue and Mr. Hicks swore that, as the trial protracted week after week and the expenses mounted to sums which threatened the respondents' resources, they spoke more than once to Mr. Cronan about the letter of June 3 and requested him to urge his clients on the island to contribute to the cost. If they told the truth, Mr. Cronan at least twice left the trial and went to Portland for the purpose of inducing his clients on the

island to contribute to the expenses. It is clear that Mr. Cronan discharged some of the expenses. For example, he paid one of the veterinarians $1,856.55. He also paid many smaller items of expense which, presumably, were part of the cost of establishing the initial liability of the Aluminum Company. Those items constitute in part the total of $3,127.34 for which the appellants sought judgment when this litigation was instituted.

Mr. Cronan, as we have seen, swore than he said nothing to anyone about the letter of June 3, 1950, until Dr. Phillips was giving his testimony as a witness for the defendant Aluminum Company. By that time, the plaintiffs in that case (these respondents) had rested their case, and they had already borne the major part of the expenses of the trial. If Mr. Cronan did not mention the letter of June 3 either to Mr. Tongue or Mr. Hicks until Dr. Phillips was testifying, then the letter remained unmentioned by him until July 11 or 12; that is, until the sixth week of the ten-week trial.

According to Mr. Cronan's testimony, he deemed the letter of June 3 as nothing more than an offer. He swore that while Dr. Phillips was testifying he made Mr. Tongue an offer for expense sharing whereby each farmer on the island would contribute to the costs of the litigation according to the number of acres he owned.

■ The foregoing will suffice as a portrayal of the part of the evidence which is germane to the first assignment of error. We are, of course, bound by the jury's verdict, which evidently embraced the respondents' version of the evidence. Therefore, as we proceed, we will deem that the appellants made, on behalf of their island clients, the promise which Mr. Tongue

related, and we will also believe, as the appellants say we should, that they had no authority to make the promise.

■ A cause of action for an agent's breach of his implied warranty of authority to contract for his principal does not arise unless his principal would have been bound if the agent had been authorized to make the contract. *Hermann v. Clark*, 108 Or 457, 219 P 608; Mechem on Agency, 2d ed, § 1401; Restatement of the Law, Agency, § 329; and 3 CJS, Agency, § 212, p 118. The appellants argue that the counterclaim does not state a cause of action because, so they say, no consideration was pleaded for the promise of the persons whom the appellants assumed to represent.

The first question presented is whether any consideration was pleaded for the promise made in behalf of the appellants' island clients. In Restatement of the Law, Contracts, § 75, consideration is defined as an act other than a promise, or as a return promise, bargained for and given in exchange for the promise. We shall now determine whether the above-quoted letter of June 3, 1950, which, according to the respondents, represents the contract, states consideration for a bilateral contract.

The respondents maintain that the evidence above reviewed shows that they promised to bear a pro rata share of the expenses of the lawsuit, and that their promise to do so was consideration for the promise made by the appellants in behalf of their clients on the island. It may be that such was the consideration concerning which the parties bargained. As we have seen, the other clients of the appellants, as well as the appellants themselves, had a vital interest in seeing to it that the respondents' case was ably presented to the court. However, for reasons which we will later

state, we prefer not to rest our decision upon the view that the parties bargained for a joint prosecution of the case.

The respondents argue that, in reliance upon the promise of the appellants, they incurred liability for costs and expenses; they urge that those liabilities which they incurred in that manner constitute consideration. *Small v. Paulson,* 187 Or 76, 209 P2d 779, was an action by a real estate broker to recover a commission from an owner of timberland who had employed him to find a buyer. The theory of the broker's case was that he found an optionee whose rights were assigned to and exercised by the purchaser. In reversing judgment for the broker, we decided that the defendant had given no option to purchase because the alleged optionee had given no consideration for the undertaking of the defendant landowner. We pointed out that a preliminary cruise which the alleged optionee had made did not constitute consideration because the cruise was not performed at the request of the landowner. The rule which controlled that phase of the case, and which is applicable to the contention of these respondents, was expressed in this way by Justice Holmes, in *Wisconsin & Michigan R. v. Powers,* 191 US 379, 24 S Ct 107, 48 L Ed 229:

> "The promise and the consideration must purport to be the motive each for the other, in whole or at least in part. It is not enough that the promise induces the detriment, or that the detriment induces the promise, if the other half is wanting."

We think that we ought to rest our disposition of this case upon the theory of consideration which has received the most attention in the briefs. Accordingly, we will brush aside the above contentions and proceed

to the one which apparently drew out of the parties their best efforts.

We approve the definition of consideration given in Restatement of the Law, Contracts, § 75, of which we have taken notice. However, the Restatement itself takes notice of instances where informal promises are deemed binding even though orthodox consideration is lacking. See Restatement of the Law, Contracts, §§ 86-90. The section last cited follows:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Illustration 3 following the above section reads as follows:

"3. A promises B that if B will go to college and complete his course he will give him $5000. B goes to college and has nearly completed his course when A notifies him of an intention to revoke the promise. A's promise is binding."

■ The principle set forth in § 90, just quoted, is often spoken of as the doctrine of promissory estoppel. The term "promissory estoppel" is new, but the principle is old. In Ames, Lectures on Legal History, p 143, it is said: "That equity gave relief, before 1500, to a plaintiff who had incurred detriment on the faith of the defendant's promise, is reasonably clear, although there are but three reported cases." The principle recognizes that, under favorable circumstances, action taken in reliance upon a gratuitous promise constitutes ground for enforcing the promise. Accordingly, we are required to determine whether the action of the respondents in incurring the litigation expenses, in

reliance upon the promise that appellants' island clients would share them, comes within the doctrine. If the situation comes within the doctrine, the promises could have been enforced against the appellants' clients; assuming, of course, that the appellants had authority to bind their clients.

*Small v. Paulson,* 187 Or 76, 209 P2d 779, took notice of the doctrine of promissory estoppel, but ruled that it did not apply to the facts of that case because the promise had not induced action of a definite and substantial character. It said:

"* * * If this were a case in which Bogle were trying to enforce his option we think it could not be said either that he had taken the action contemplated or that injustice could be avoided only by enforcement of the promise."

*Small v. Paulson,* from which we just quoted, is the first decision by this court which employed the term "promissory estoppel". That decision, after taking note of the circumstances which a party must establish in order to obtain the benefit of the doctrine, held that the record did not contain the needed proof. Earlier decisions by this court applied rules of law which constitute integral parts of the principle now known as promissory estoppel but did not employ that term. Some of them depended largely upon the rules which govern equitable estoppel and others resorted to phases of the law of fraud. Possibly if those cases were before this court today the decisions would speak of promissory estoppel. We shall now take note of them.

From *David v. Brokaw,* 121 Or 591, 256 P 186, we take the following:

"* * * If the agreement amounted to a mere license, it is revocable by the licensor at his pleasure.

However, if relying upon the license plaintiffs have made material and permanent improvements the license has become irrevocable, if its revocation would constitute a fraud upon plaintiffs.''

In that decision the court quoted from *Heisley v. Eastman,* 102 Or 137, 201 P 872, as follows:

" * * * An oral and gratuitous permission when acted upon by the expenditure of a considerable sum of money in the construction of valuable improvements, which have been made on the faith of such permission and would not have been made in the absence of such permission and would be either destroyed or materially lessened in value by a revocation of such permission presents a situation making the doctrine of equitable estoppel peculiarly applicable, especially when the limits of that doctrine are measured by the reasoning employed in our own precedents upon the subject of oral licenses; and this conclusion is in harmony with the views expressed by some other courts: * * *.''

The rule that a license, in terms permanent, cannot be revoked if the licensee, in reliance upon it, made serious changes in his position, was early employed in this state: *Bowman v. Bowman,* 35 Or 279, 57 P 546. See, to like effect, *Shaw v. Proffitt,* 57 Or 192, 109 P 584, 110 P 1092, Ann Cas 1913A, 63. The decision in *Heisley v. Eastman,* supra, cited the pioneer Pennsylvania case of *Rerick v. Kern,* 14 Serg. & R. 267, 16 Am Dec 497, which Williston on Contracts, Rev Ed, § 139, employs as illustrative of the operation of the doctrine of promissory estoppel. He characterizes similarly the Bowman and Shaw decisions of this court.

In *Putnam v. Chase,* 106 Or 440, 212 P 365, a note, given gratuitously to a bank in questionable financial condition so that it could be shown to the bank examiner, was held enforceable by the receiver of the bank

after insolvency. Both Corbin and Williston cite instances of that kind as governed by the doctrine of promissory estoppel. See Williston on Contracts, Rev Ed, § 139, and Corbin on Contracts, § 197. The citation last given contains this:

"Whether there has been fraudulent intent or not, it would be scandalous not to enforce payment of the note, if otherwise any depositor or other creditor would be a loser. Justification for such enforcement can be phrased in terms of 'estoppel' or in terms of the action in reliance by various parties. In any case, there has been no consideration in the sense of a bargained-for equivalent."

This court has sustained the rights of a donee to specific performance, who, relying upon the promise to give him a tract of land, entered upon the latter and made valuable improvements. *Pugh v. Spicknall*, 43 Or 489, 73 P 1020, 74 P 485; *Scott v. Lewis*, 40 Or 37, 66 P 299. More recently this court, in *Blackburn v. Maloney*, 189 Or 76, 218 P2d 459, ruled:

"If Blackburn orally consented to an extension, and the party to the contract acted upon such consent, then, upon the principle of estoppel, Blackburn could not thereafter, prior to the expiration of the agreed period of extension, hold the agreement of extension void because not in writing, and treat the contract as if the right of the other contracting party had been forfeited by the expiration of the time originally fixed."

The foregoing review indicates that this court is committed to the principles which underlie the doctrine of promissory estoppel. It will be seen that our cases arose, not out of subscriptions to charities, but in part out of commercial transactions. We shall now view the doctrine in its broader aspects and in so doing will turn to the textbooks and the decisions of other jurisdictions. We will make no effort to take

note of all of the available decisions, but only of those that are representative of others that bear upon the issues before us.

■ The principal criteria for determining when action, taken in alleged reliance upon a promise, renders the latter enforceable are actual reliance on the promise, a substantial change in position and foreseeability by the promisor, as a reasonable man, that his promise would induce conduct of the kind which occurred. Corbin on Contracts, § 200; Williston on Contracts, § 140. When those broad tests are met, justice generally requires the enforcement of the promise through the medium of an appropriate contractual remedy. Corbin on Contracts, § 200.

A bargain has been absent in many situations where a promise has been enforced by judicial action because it induced conduct in reliance upon it. Corbin on Contracts, §§ 193 through 209, and Williston on Contracts, Rev Ed, § 139. Perhaps the most noteworthy are instances involving subscriptions to eleemosynary institutions. In *Irwin v. Lombard University*, 56 Ohio St 9, 46 NE 63, 36 LRA 239, 60 Am St 727, the court held that the accomplishment of the purpose for which the plaintiff, a college, was incorporated was consideration for a promissory note given to the college by the defendant's intestate. Referring to the maker of the note, the court said:

"It does not appear that anything of value passed from the university to Gilpin as a consideration for the note, nor that he requested it to expend money on the faith of his promise, * * * except as such requests are to be inferred from the circumstances of himself and others when they made donations * * *. It also appears that these donations and obligations were sufficient in amount and character to encourage the corporation to ex-

pend money and incur obligations in carrying out the purposes of its creation. The enterprise to which Gilpin and others contributed and subscribed did not fail, but went forward."

Many decisions similar to the one just reviewed are cited and analyzed in Corbin on Contracts, § 198, wherein it is said:

"The reason most commonly given for enforcing charitable subscriptions is that the promisee has given a sufficient consideration in reliance on the subscription. Usually this action is the carrying out of the purpose for which the subscription was made. Buildings are built, contracts are let, professorships are established. The subscriber desired the action either specifically or in kind, and had reason to foresee that it would be taken."

Other instances in which a promise, unattended by an orthodox consideration, was rendered enforceable through the subsequent action of the promisee, which was induced by the promise, are found in cases arising out of a promise to convey land. In examples of that kind, the donee was impelled by the promise to take possession of the land and make improvements upon it. We have already taken note of our own decisions in cases of that character. In *Greiner v. Greiner,* 131 Kan 760, 293 P 759, the defendant was one of several sons of a decedent, Peter Greiner, who disinherited some of his children although making provision for others. Peter's widow, in an effort to deal with all of the children alike, told the defendant that she wanted him to have the tract of 80 acres which was the subject of the case, and that she would move a house upon it which he and his family could occupy. About the same time she made provision for the other disinherited son by the payment to him of a sum of money. Depending upon his mother's promise, the

defendant quit a tract of land which he had been home-steading and moved to the farm property which his mother had promised to convey to him. He also made some lasting and valuable improvements upon the tract, in further reliance upon his mother's promise. In affirming the decree of the trial court, which ordered the execution of a deed to the defendant, the decision under review depended upon Restatement of the Law, Contracts, § 90, quoted in a preceding paragraph of this opinion. In *Martin v. Dixie Planing Mill*, 199 Miss 455, 24 So2d 332, the plaintiff had purchased from the defendant, for the sum of $1,800, the timber upon a tract of land and had been given a license for six months to remove the timber. When only two months remained for the removal of the timber, the defendant informed the plaintiff that it could remove the timber in the remaining period, but that, due to the wet condition of the ground, its heavy equipment would damage her land, her roads and the young timber. At that point a six months extension of the license was granted, but no consideration was paid for it. In sustaining the validity of the extended license, the court quoted Restatement of the Law, Contracts, § 90, and said:

> "* * * Appellee had the right to then remove it. Appellee could and would have done so but for the execution of the extension agreement. It refrained from doing so, relying upon the promise of the extension of time. If it cannot now do so it loses the $1,800 it paid Mrs. Martin for the timber and any profit it may have therein. This would be a great injustice which 'can be avoided only by enforcement of the promise.'"

*Phalen v. United States Trust Co.*, 186 NY 178, 78 NE 943, 7 LRA 734, 9 Ann Cas 505, held that, nothwith-standing the fact that marriage settlements are commonly deemed gratuitous, such a settlement is rendered

enforceable when, in reliance upon the promise, it is followed by an actual marriage ceremony. The majority of the court in that case rationalized the case into the concept of consideration through resort to the plaintiff's performance of his part of the bargain. It said: "He was a party to the agreement and performed his part by the marriage with his wife." The minority, however, took note of the absence of the "bargain", which usually is a feature of contract transactions, by saying: "It is true that he afterwards married; but his father never requested him to marry, and he never promised his father that he would." For other decisions, to like effect, see Corbin on Contracts, § 206, footnote 26, and Williston on Contracts, Rev Ed, § 139.

A promise, even though it is unaccompanied with consideration, may induce another to forego the assertion of rights at a time when action would have been effective. For example, in *Saunders Co. v. Galbraith,* 40 Ohio App 155, 178 NE 34, it appeared that one Dr. Galbraith, who had conducted a bookselling agency for the plaintiff, was indebted to it in a large sum of money at the time of his death. By his will, Dr. Galbraith devised all of his property to his wife, defendant in the action. Shortly after the death, an officer of the plaintiff called upon the defendant and her stepson, who desired to continue the agency, for the purpose of collecting the debt. Payment could have been made only by selling the real property of the estate and also probably an item owned by the defendant. The defendant assured the plaintiff that she would sell the properties and discharge the indebtedness; thereupon the plaintiff filed no claim against the estate. Later, she executed the notes and mortgage upon which the suit under analysis was based. The defense was lack of consideration. In reversing a decree for the defendant,

the decision under review quoted Restatement of the Law, Contracts, § 90, and said:

"The facts of the case at bar come squarely within the terms of the section referred to. Mrs. Galbraith's promise was reasonably expected to and did induce the plaintiff to forbear asserting its claim against the estate at a time when such assertion could have been effective. If her promise, so acted upon by the plaintiff, is not enforced, the plaintiff has lost its right to realize from the estate on an admittedly just claim, and this unjust loss can be avoided only by the enforcement of the defendant's promise."

In *Siegel v. Spear & Co.*, 234 NY 479, 138 NE 414, the defendant, as chattel mortgagee of some household goods which the plaintiff had purchased from it, stored them free of charge. It also promised to have the goods insured at the plaintiff's expense for his benefit, but neglected to do so. Later, the uninsured goods were destroyed. The court held that the gratuitous promise to obtain the insurance, followed by the plaintiff's forbearance to obtain insurance, rendered the promise enforceable.

Similar in principle are cases where the change of position, in reliance upon the promise, although not affording a cause of action upon it, precludes the promissor from asserting a defense to an action or permits the promisee to use the promise defensively. Thus a promise not to plead the statute of limitations which is made before the limitation period has elapsed and which induces the promisee to forbear suit until after the limitation period has run deprives the promissor of the defense. *Holman v. Omaha & C. B. R. Co.*, 117 Iowa 268, 90 NW 833, 62 LRA 395, 94 Am St 293. Other decisions to like effect are cited in Corbin on Contracts, § 194, and Williston on Contracts, Rev Ed, § 193. A

promise by a lessor to release from the covenants of the lease one of the co-lessees, and which induces the co-lessee to whom the promise was made to establish a new business venture, is a defense to an action for rent. *Fried v. Fisher,* 328 Pa 497, 196 A 39, 115 ALR 147. Williston on Contracts, § 139, indicates that the cases just reviewed come within the doctrine of waiver in its strict sense. Section 679 of that treatise defines waiver in its strict sense in this manner:

> "A promise or permission express or implied in fact, supported only by action in reliance thereon, to excuse performance in the future of a condition or to give up a defense not yet arisen, which would otherwise prevent recovery on an obligation. If waiver can be given any legal meaning narrower than the surrender of any right or defense by any means, this kind of surrender may properly be given the name. The promise is binding and the permission effective though without consideration. There is often said to be an estoppel here and the case is said to be distinguishable from waiver, but there is not a true estoppel, * * *. It may be called a promissory estoppel."

The rule that a substantial change of position in justifiable reliance upon a promise, renders the latter obligatory has been applied to commercial as well as non-commercial transactions. We have already taken notice of several instances. *Hunter v. Sparling,* 87 Cal App 2d 711, 197 P2d 807, was an action by a retired bank employee to recover a retirement allowance. The court held that continuation in service for the period of time which was necessary in order to receive the pension constituted consideration for the employer's promise. It also said:

> "Our conclusion that there was an enforceable obligation to pay the balance of the retirement allowance need not be predicated solely upon the

theory that there was an offer and acceptance and consideration. Even if the promise had been originally intended as a promise to make a gift, under the facts here involved, such promise would be enforceable. The undisputed and found facts show that after plaintiff knew of the promise, he received several offers of employment by other banks and turned them down because, if accepted, he would lose his retirement allowance. The promise was one that was designed to accomplish just that result. Under such circumstances the doctrine of prommissory estoppel is applicable."

In *Robert Gordon, Inc. v. Ingersoll Rand Co.,* 117 F2d 654, where a prime contractor sought the aid of the doctrine of promissory estoppel in enforcing its interpretation of a subcontractor's ambiguous bid, the court held that the bid was not an offer. But in so doing, it said:

"The mere fact that the transaction is commercial in nature should not preclude the use of the promissory estoppel."

In *Goodman v. Dicker,* 169 F2d 684, 83 US App D.C. 353, the defendant, a radio dealer, promised to give to the plaintiff a dealer's franchise to sell radios. After the plaintiff had justifiably incurred expenses in preparation to act as dealer, the defendant repudiated his promise. He was held liable for the expenditures. *Northwestern Engineering Co. v. Ellerman,* 69 SD 397, 10 NW2d 879, held that a subcontractor was bound on his promise to perform part of the work contemplated in an airbase construction contract because the prime contractor relied upon the promise in preparing its bid which resulted in the award to it of the construction contract. The court said:

"We are inclined to agree with respondents' contention and find that the agreement is without

the customary elements of a valid consideration. Is this fatal to appellant's action? The pleaded facts disclose that knowing of appellant's intention and desire to place a bid on the airport project, the respondents promised to enter into a binding contract to do the specified work at a fixed price, this promise was not withdrawn, and relying upon the promise, the appellant submitted its bid to the government, as contemplated in the agreement. Obviously it would seem unjust and unfair, after appellant was declared the successful bidder and imposed with all the obligations of such, to allow respondents to then retract their promise and permit the effect of such retraction to fall upon the appellant. Other courts have been confronted with somewhat similar situations to that which now confronts us. The result has been that there has arisen in the law a doctrine often referred to as 'promissory estoppel.' ''

There are decisions which rejected the view that action in reliance in itself is sufficient to make a promise binding. Corbin on Contracts, § 209, cites and reveals the error in some of the cases which took that position. For example, that treatise says:

"In some of them, the court seems unaware of the validity of a unilateral contract, finding that the evidence does not show any promise of the action or forbearance. * * * In others, the facts show that the promissor not only did not request, or bargain for, the action or forbearance, but also that he had no sufficient reason to foresee that it would take place in reliance on his promise. In still others, * * * .''

We turn to *James Baird Co. v. Gimbel Bros.*, 64 F2d 344, which holds that the doctrine of reliance is not to be employed to make binding an offer which requested a consideration different in kind from that which the offeree gave. In the James Baird case, the defendant

offered to supply linoleum to the plaintiff at specified prices for acceptance after the plaintiff had been awarded a prospective construction contract. The defendant's offer was revoked after the plaintiff submitted his bid, but before he was awarded the construction contract. The court held that the plaintiff's reliance upon the offer in submitting his bid did not amount to an acceptance of the offer. It said:

> "In the case at bar the defendant offered to deliver the linoleum in exchange for the plaintiff's acceptance, not for its bid, which was a matter of indifference to it. That offer could become a promise to deliver only when the equivalent was received; that is, when the plaintiff promised to take and pay for it."

The reasoning was similar to that in *Small v. Paulson,* supra. In the James Baird case, the court took note of the fact that, although the doctrine of promissory estoppel was at one time chiefly employed in "cases where persons subscribe to a venture, usually charitable", it is now "applied much more broadly" and "has now been generalized in Section 90, of the Restatement of Contracts."

■ Thus, there are several areas in which the action in reliance doctrine has been applied to make a promise binding. It applies in instances of waiver in its strict sense. Another group of cases, namely, those involving charitable subscriptions, marriage settlements, gifts of land, licenses and promises by a bailee, firmly establish that, in an appropriate case, action in reliance makes a promise judicially enforceable. We do not think that there is anything peculiar to this line of cases or that they impel the conclusion that the doctrine is anomalous and should be held in close leash. Some courts, as is evident from the above review and from

the cases cited in Williston on Contracts, Rev Ed, § 139, and Corbin on Contracts, §§ 193-209, apparently approve the doctrine for general application. Historically, action in reliance was the basis for enforcing informal promises in assumpsit. Corbin on Contracts, § 195, and Ames, History of Assumpsit, 2 Harv L Rev 1. Therefore, we believe that the doctrine of reliance, whereby an unrecompensed promise can be rendered enforceable, is one of general application; provided, of course, that the individual case is brought fully within the rigorous exactions of the doctrine.

The appellants maintain that the respondents did not properly plead a promissory estoppel. It is true that the respondents did not expressly characterize any of the facts in their counterclaim as a promissory estoppel, but that was unnecessary and, in any event, the respondents' pleadings are sufficient to constitute a cause of action. The counterclaim recites at length the background of this lawsuit, the facts from which the legal proposition can be implied that the appellants, as reasonable men, should have foreseen that the promise which they made would induce conduct of the kind that actually occurred. The counterclaim also states that the respondents relied upon the promise of the appellants and sets forth facts which indicate that the respondents' change in position, in reliance upon the promise, was costly. Hence, the appellants' contention regarding the pleading is without merit.

Arguing further in behalf of the first assignment of error, the appellants urge that the respondents should have been nonsuited on the counterclaim because the respondents did not prove, so the appellants say, that they relied on the promise. As to that, the evidence presented a question for the jury. The appellants also make the assertion that, since the judgment

which the respondents recovered is in a sum larger than the expenses of the litigation, the respondents were not damaged when it developed that the appellants lacked authority to make the promise upon which the respondents relied when they proceeded with the expensive trial. We believe that the absence of validity in that contention is self-evident but we will, nevertheless, give it attention. The record contains conclusive evidence that the respondents suffered a substantial detriment when they relied upon the appellants' unauthorized promise. By accepting and depending upon that promise they forewent the other alternatives, which at that time were available to them and which are enumerated in a preceding paragraph of this opinion. Relinquishing those alternatives upon the faith of a promise, which later proved to be unauthorized, obviously amounted to a substantial detriment. Further, when it developed that the promise was unenforceable, the respondents, obviously, suffered damages in a large sum. First, we take note of the fact that uncontradicted testimony given by the respondent, William Fraser, declares that virtually every dollar of the $60,000 judgment was consumed in the discharge of expense items. After he had so testified, he asserted from the witness stand: "It just makes an old man out of you. And it costs you more than you get." In the preparation of the counterclaim, the respondents estimated that $26,000 of their total expenses were incurred in establishing the initial liability of the Aluminum Company, and that under the pro rating quotient, $18,200 of that total was payable by the other fifteen claimants. Although the appellants appear to believe that some items which make up the total of $26,000 were not incurred in establishing the initial liability, they do not question the entire sum; in fact, the items

which they consider questionable are small. Therefore, it is clear that if the appellants' promise, upon which the respondents relied when they went ahead with the trial, had been authorized, the fifteen claimants, whom the appellants represented, would have paid to the respondents long ago a substantial part of the $18,200. The jury found that the amount was $12,776.26 (less a credit of $357.00). In face of the evidence we have no right to ignore the jury's finding.

The above is our analysis of the first assignment of error. According to our belief, it possesses no merit.

■ The second assignment of error follows:

"The Court erred in failing to grant appellants' motion for an involuntary nonsuit on the ground that respondents failed to show they relied on the alleged agreement."

The respondents presented evidence showing that before the letter, dated June 3, 1950, addressed to appellant Cronan and signed by Hicks, Davis & Tongue, was delivered it was shown to them and received their express approval. They also presented evidence which indicated that they relied upon the agreement expressed in that letter when they made their litigation expenditures. It is our belief that the issue of reliance was properly submitted to the jury. We dismiss this assignment of error.

Before considering intervening assignments of error, we pass on to the sixth, which reads as follows:

"The Court erred in failing to grant appellants' motion for an involuntary nonsuit on the ground that respondents' claim was prematurely brought."

The foregoing assignment of error raises questions as to when a cause of action for a breach of warranty

of authority accrues and whether compensatory damages are an element of such a cause of action.

The unauthorized promise of the appellants' clients called for a sharing of expenses when the claims of all the landowners were settled. The appellants contend that the respondents' claim has not been fully adjudicated and that one other farmer has a pending claim. The jury was not bound to accept that view of the situation and evidently did not do so. It is clear that no claim for damage to livestock remains unadjusted, and the appellants themselves say:

"The initial liability to be pro-rated was the cost of *liability for damage to cattle,* not the cost of liability for depreciated land values, growing crops or anything else."

But, based upon a contention that something remains unadjusted, the appellants argue that the action was brought too soon and that the damages, if any, for which they are liable cannot be determined.

*Moore v. Maddock,* 251 NY 420, 167 NE 572, is the most informative decision that we found bearing upon the question as to when a cause of action for a breach of warranty of authority accrues. There, the plaintiff performed services for the corporation, of which the defendant was president, in a justifiable belief that he was authorized to act for the corporation in contracting for the plaintiff's services. On February 17, 1922, the plaintiff received a letter, signed by the defendant, in which the corporation repudiated the contract which the plaintiff thought he had with the corporation. In March, 1923, the plaintiff sued the corporation and for the first time was informed that the defendant had no authority to represent it. The court rejected the arguments that the statute of limita-

tions began to run when the assumption of authority was first made and when the principal repudiated the contract. The court said:

> " * * * The defendant maintains * * * the warranty was broken as soon as made, and only when made. That does not follow. * * *
>
> " * * * Finally, the corporation repudiated the contract, but in a letter which the defendant signed as president. There was no assertion, in that letter, that the defendant as president of the corporation had no authority to contract with the plaintiff for his services. On the contrary, it * * * in effect, constituted a renewal of his assertion that he did have authority * * *."

The principal issue in that case was whether the cause accrued when the warranty was made or at some subsequent time, since the defendant was deemed to have renewed his assertion of authority. The court concluded that the warranty continued to run as long as assertions of authority were made, but intimated that in different circumstances a different result might be reached. It said:

> " * * * We hold only that, where a person makes an assertion of authority to bind a principal, which is intended and understood to be a continuing assertion, the warranty of the truth of that assertion which the law implies must from its nature be a continuing warranty. The plaintiff's cause of action did not accrue till after he received the letter signed by the defendant as president of the corporation. We do not attempt to indicate what would be our decision if the circumstances presented were different."

We approve the declaration just quoted which characterized the agent's implied warranty of authority as a continuing one, and hold that a cause of action accrues when the third party learns of the agent's lack

of authority. This is in accord with what was said concerning *White v. Madison,* 26 NY 117, in *Hermann v. Clark,* 108 Or 457, 219 P 608:

"In White v. Madison, 26 N. Y. 117, 124, the view was expressed that not only in a specified class of cases but also in all cases 'where one, pretending to be an agent, has contracted as such without authority from the principal, the party contracted with, on learning the facts, must have the right to repudiate the contract, and to hold the assumed agent immediately responsible for damages, without waiting for the time when an action might be maintained on the contract itself; and the damages must be measured, not by the contract, but by the injury resulting from the agent's want of power.'

"In other words, the doctrine of the excerpt last quoted is that a right of action accrues to the third person the moment he learns of the want of authority of the assumed agent."

Therefore, after learning that the appellants lacked authority to bind their clients, the respondents were not required to wait until performance by them would have been due had the contract been binding.

Although we have not been able to find a case in point, we do not believe that compensatory or actual damage is a necessary element of a cause of action for an agent's breach of his implied warranty of authority. It is true that there is language in some of the cases similar to that in *Anderson v. Adams,* 43 Or 621, 74 P 215, to the effect that the agent's warranty is one of indemnity for any loss which the third party sustains if the agent lacks authority. But the principal purpose of the warranty is to safeguard the third person from the loss of a contract which he thinks is his. No out-of-pocket loss is necessary to sustain the action even though such a loss might, in a proper

case, be recovered if it has been incurred. For, generally, in contract actions actual damages are not an element of the cause of action because nominal, rather than compensatory, damages can be recovered for a breach. 1 Sedgwick on Damages, pp 167, 179. An action for breach of warranty of authority is an action on the contract. *Cochran v. Baker,* 34 Or 555, 52 P 520, 56 P 641, declares:

"* * * The question is a new one in this state, but we are impressed with the view that under the facts of the case at bar the plaintiffs have an action against the defendant upon his implied warranty touching his agency, and that it is one in contract, rather than in tort."

Therefore, where a claimant is entitled to nominal damages, the adverse party's motion for a nonsuit must be denied (1 Sedgwick, 9th ed, 189; *Hancock v. Hubbell,* 71 Cal 537; *Quinn v. Moore,* 15 NY 432), and the motion for a nonsuit on the grounds that defendants' damages were not capable of ascertainment is without merit. The contentions which we have just considered amount, in effect, to a postponed attack upon the sufficiency of the counterclaim as the statement of a cause of action. No demurrer had been filed to that pleading and, hence, the appellants resorted to the foregoing means for challenging that pleading. As we have seen, the record contains substantial evidence which shows that the respondents sustained both a detriment and damages when they relied upon the appellants' unauthorized promise.

The third assignment of error reads as follows:

"The Court erred in refusing to give the following requested instruction:

" 'You are further instructed that the letter of June 3, 1950, addressed to Schafer & Cronan would

not obligate any person recovering for land damages to pay any part of the costs of the trial of Fraser v. Aluminum Company of America.' "

The appellants requested that instruction because they contend that the agreement represented by the letter of June 3, 1950, did not obligate any person who recovered for land damages to pay any part of the litigation expenses which the respondents incurred. Concerning this assignment of error, the appellants' brief says:

"This refused instruction squarely raised the question whether there was a failure of consideration as to one of the parties to the alleged contract if, indeed, he ever furnished any consideration.

" * * * If the alleged contract be urged to mean that the promisors were bargaining for the act of trying their lawsuit by respondents, they must also have been bargaining for consideration to be furnished by the 'Mr. Hall' referred to in the June 3 letter. * * * Did Mr. Hall furnish any consideration or, if he did, has that consideration failed?"

Going on, the brief says that Hall had no cattle, and "since he had no cattle, no pro rate would ever have been payable by him." As a matter of fact, the record indicates that Hall made a substantial contribution toward the litigation expenses.

The appellants contend that as to their clients there would have been a failure of consideration which would have relieved them of their obligation. The argument concerning failure of consideration is that the letter required only the farmers who recovered for cattle damages to share the respondents' expense, and that the evidence indicates that Hall, who was a party to the arrangement contemplated by the letter, had

no cattle and claimed only land damages. From that circumstance it is urged that there was a failure of consideration, for it is said that Hall paid nothing when the letter contemplated that he should contribute with the others.

Failure of consideration was not pleaded, and these contentions were not submitted squarely to the trial judge. We do not agree with the appellants' interpretation of the letter. It can be read to bind Hall if Hicks, Davis & Tongue were authorized, as was the fact, to bind him. There is an elementary difference between no consideration, which would be the case if Hall had not been bound, and a failure of consideration, which characterizes situations where there is a consideration but also a failure of the contemplated performance.

We dismiss this assignment of error as lacking in merit.

The fourth assignment of error reads as follows:

"The Court erred in refusing to grant appellants' motion for a new trial on the ground that there was a failure of proof as to the cost of initial liability."

In support of that assignment of error, the appellants maintain that the respondents did not segregate the expenses incurred in proving initial liability from those incurred in establishing the rest of their case. In this jurisdiction it is well settled that an order denying a motion for a new trial is not appealable where the grounds of the motion could have been, but were not, urged prior to judgment. *Oldland v. Oregon Coal & Nav. Co.*, 55 Or 340, 102 P 596. The following, which is quoted from *Colgan v. Farmers & Mechanics*

*Bank,* 59 Or 469, 106 P 1134, 114 P 460, 117 P 807, indicates the objectionable feature of a different procedure:

> " * * * A party having a suitable occasion to object and except to anything considered detrimental to his interests must take advantage of the harmful act or conduct when it occurs, if he has knowledge thereof, for he will not be permitted to speculate on a favorable verdict and, if disappointed, then seek to question the proceedings by a motion for a new trial."

A different rule applies where the grounds for a new trial are not discovered until after judgment, such as the misconduct of a juror. See *Goodeve v. Thompson,* 68 Or 411, 136 P 670, 137 P 744. *Telkamp v. McIlvane,* 184 Or 474, 199 P2d 246, announced no change in the law concerning grounds for appeal when a new trial is denied. There, we held only that the motion for a new trial and proceedings thereon must be made a part of the judgment roll if error is predicated upon a denial of a new trial. The appellants' assertion that there was failure of proof is, in substance, an objection that there was no proof of compensatory damages. This could have been brought to the attention of the trial judge by a motion that he direct the jury to return a verdict for nominal damages only. 88 CJS, Trial, § 257, p 674. Contentions of that kind come too late after judgment. Therefore, the trial court's refusal to grant a new trial is not appealable. Nothing said herein should be construed as contrary to *Fowler v. Courtemanche,* 202 Or 413, 274 P2d 258, where we held that ORS 18.140 authorizes an appeal from an order denying a new trial in instances where the moving party moves alternatively for judgment notwithstanding the verdict and for a new trial.

The fourth assignment of error is denied as lacking in merit.

■ The fifth assignment of error follows:

"On the motion for a new trial the Court erred in refusing to bring in new parties."

In support of that assignment of error, the appellants contend that the trial judge should have joined Hicks, Davis & Tongue as parties defendant. Since that firm requested the appellants, according to the latter, to make most of the expenditures which constitute the basis of the complaint, and falsely represented to their principals, according to further contentions of the appellants, that the contract was entered into which is the basis of the counterclaim, the appellants believe that joinder was mandatory. However, neither of these reasons is ground for joinder, which, in this state, is covered by ORS 13.110, which reads:

"In actions or suits the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in."

In 67 CJS, Parties, § 46, p 969, it is said:

"Under the codes and practice acts, in an action on a contract by one of the parties thereto, the only parties defendant who may be necessary are the other parties to the contract sued on and those who have an interest in the matter in dispute which will be affected by the action."

The rights of Hicks, Davis & Tongue were not prejudiced by the refusal to join them. A complete determination of the controversy was possible without their presence as parties. They had no interest in the con-

tractual claims in issue. The assignment of error as to joinder is without merit.

The seventh assignment of error follows:

"The Court erred in refusing to give the following requested instruction:

" 'You are instructed that, if you find from the evidence the defendants in fact did not inform the plaintiffs they should not expend money in connection with this trial or that if such instructions were given the defendants subsequently ratified expenditures by the plaintiffs, you will then return your verdict in favor of the plaintiffs in the sum of $3,068.07.' "

If that instruction had been given and if the jury had found that "the defendants in fact did not inform the plaintiffs they should not expend money", or that "the defendants subsequently ratified expenditures by the plaintiffs", the jury's consideration of the counterclaim would have been withdrawn. Likewise, had the instruction been given, and if the jury had found that "the defendants in fact did not inform the plaintiffs they should not expend money", the jury would have been required to return a verdict in favor of the plaintiffs in the sum of $3,068.07, whether or not that sum represented the plaintiffs' purported expenditures. It seems clear that no error was committed when the requested instruction was not given. We add that the instruction which was given upon the subject of the request was, in our belief, proper and expressed with clarity. No exception was taken to it. Accordingly, we conclude that the seventh assignment of error, being the last, possesses no merit.

We have bestowed extensive attention upon this appeal, for we realize its importance, not only to the

parties to this case, but, also, to the members of the bar who are engaged in the handling of litigation. We, likewise, appreciate the importance of the principle of promissory estoppel, or, as it is at times termed, justifiable reliance. Evidently, since the days when consideration assumed its orthodox form, commercial practices have moved to somewhat higher ground. Under prevailing conditions, a man in business is taken at his word and, accordingly, when the law renders a promise enforceable, if the individual who made it could reasonably have foreseen that the other would act in reliance upon it, it simply gives effect to the predominant commercial practices.

In order to avoid a misreading of this decision, we add that sometime after entry of judgment in the respondents' case against the Aluminum Company, the appellants wrote a letter to each of their fifteen clients on Sauvies Island in which they stated:

> "We understand that there has been some rumor and speculation concerning a contention by Mr. Fraser that the balance of the plaintiffs against Alcoa are obligated to contribute to his costs. You know, of course, that you have never authorized us to obligate you for any part of these costs with the exception of the employment of Ray Maiers * * *."

That letter, of course, rendered it impossible for the respondents to recover their expenses from those for whom the appellants made the pro rating agreement of June 3, 1950, and later this case was instituted.

The above constitutes our disposal of the assignments of error. We have found nothing in the record which justifies a reversal. Accordingly, the judgment of the circuit court is affirmed.

## ON PETITIONERS' MOTION

*Harlow F. Lenon,* Portland, for the motion.

*Collier, Bernard, Bernard & Edwards,* Portland, contra.

ROSSMAN, J.

This cause is before us upon a motion filed by the appellants under the provisions of 28 USCA, § 2101 (f) ''for an order staying the mandate and staying execution and enforcement of the judgment herein for a reasonable time to enable them to obtain a Writ of Certiorari from the Supreme Court of the United States   *   *   *.'' The motion is sustained and the stay is granted. Our action in granting the appellants the

relief which they seek must not be construed as an indication from us that, in our opinion, the case was decided in this court upon a theory which was not at issue in, and which was not presented to, the circuit court. The order which grants this relief will be predicated upon the condition that the appellants apply for the writ promptly, and in no event later than May 15, 1956.